**Belaid GHEREBI, Petitioner,**

v.

**George Walker BUSH, et al., Respondents.**

**No. CV 03–1267–AHM.**

United States District Court, C.D. California.

May 13, 2003.

Stephen Yagman, Kathryn S. Bloomfield, Marion R. Yagman, Joseph Reichmann, Yagman & Yagman & Reichmann & Bloomfield, Venice Beach, CA, for petitioner.

Becky Walker, Asst. U.S. Attorney, Debra Yang, U.S. Attorney, Los Angeles, CA, for respondents.

## ORDER DISMISSING PETITION FOR LACK OF JURISDICTION

MATZ, District Judge.

## INTRODUCTION

The petition for a writ of habeas corpus filed in this case alleges that Respondents President Bush, Secretary of Defense Rumsfeld and unnamed "military personnel" captured Falen Gherebi in Afghanistan and, since January 2002, have detained him at the Guantanamo Bay Naval Base ("Guantanamo") in Cuba. The Petitioner, Belaid Gherebi, is Falen Gherebi's brother.

Belaid Gherebi alleges that his brother is being held incommunicado, without aid of counsel, and in violation of the United States Constitution and the Third Geneva Convention. Among other forms of relief, Petitioner asks that his brother be granted access to legal counsel and "be brought physically before the Court for a determination of his conditions of detention, confinement, and status . . . ." Mem. of Law in Support of Amended Verified Petition for Writ of Habeas Corpus, at 3.

Petitioner and Respondents seek a prompt ruling on the matter of this Court's jurisdiction because they intend to proceed expeditiously to the Ninth Circuit Court of Appeals.[1] The Court is willing to accommodate their request, because the jurisdictional question addressed here is one of great importance: Do the hundreds of persons detained at Guantanamo have the right to challenge their confinement in a United States federal court?

The Court concludes that *Johnson v. Eisentrager,* 339 U.S. 763, 70 S.Ct. 936, 94

---

1. Counsel proposed that this Court issue its ruling based on briefs submitted to the Ninth Circuit more than one year ago in a different, although related, case. The Court has care-fully considered those briefs but has also considered subsequent developments, including the decision in *Al Odah v. United States,* 321 F.3d 1134 (D.C.Cir.2003).

L.Ed. 1255 (1950), and later decisions construing *Johnson*, compel the answer "no."

The Court reaches this conclusion reluctantly, however, because the prospect of the Guantanamo captives' being detained indefinitely without access to counsel, without formal notice of charges, and without trial is deeply troubling. And that is why a prompt ruling to speed appellate review is appropriate.

## BACKGROUND

The events leading to this case are well known. Following the terrorist attacks of September 11, 2001, Congress authorized the President "to use all necessary and appropriate force" against those responsible. Authorization for Use of Military Force, Pub.L. No. 107–40, 115 Stat. 224 (2001). Pursuant to that authorization, the President sent American forces to Afghanistan to wage what has been commonly referred to (but not formally declared) as a "war" against the Taliban government and the terrorist network known as Al Qaeda. Beginning in early January 2002, the Armed Forces transferred to Guantanamo scores of individuals, including Falen Gherebi, who were captured by the American military during its operations in Afghanistan.

On January 20, 2002, a group of journalists, lawyers, professors, and members of the clergy filed a petition for habeas relief on behalf of unidentified individuals detained involuntarily at Guantanamo. That petition also named as Respondents President Bush, Secretary Rumsfeld and other military personnel. The matter was assigned to this Court. After ordering the parties to brief the threshold question of

jurisdiction, the Court heard oral argument and dismissed the petition. *Coalition of Clergy v. Bush,* 189 F.Supp.2d 1036 (C.D.Cal.2002) ("*Coalition I* ").

The first basis for this Court's dismissal of the *Coalition I* petition was that the named petitioners lacked standing. The Ninth Circuit affirmed that ruling on appeal but vacated this Court's additional rulings as to the applicability of *Johnson. Coalition of Clergy v. Bush,* 310 F.3d 1153 (9th Cir.2002).[2] Respondents do not challenge Petitioner's "next friend" standing in this case, however, and the issue of *Johnson 's* effect can no longer be avoided.

## ANALYSIS

Because the Supreme Court's *Johnson* opinion compels dismissal of this petition, the Court will begin with an examination of that decision.

### A. *Johnson*

The following description of *Johnson* is taken from this Court's ruling in *Coalition I.*

In *Johnson,* Mr. Justice Jackson described "the ultimate question" as "one of jurisdiction of civil courts of the United States vis-a-vis military authorities in dealing with enemy aliens overseas." The case arose out of World War II. The habeas petitioners were twentyone German nationals who claimed to have been working in Japan for "civilian agencies of the German government" before Germany surrendered on May 8, 1945. They were taken into custody by the United States Army and convicted by a United States Military Commission of violating laws of war by engaging in

---

**2.** This Court had gone on to address those issues because it anticipated that the defects in the Coalition's claim of standing could be cured relatively easily. Not surprisingly, the Coalition has filed a second, near-identical petition purporting to cure the standing de-

fect. *Coalition of Clergy v. Bush,* No. 02–9516 AHM (JTL) (C.D. Cal. Dec. 16, 2002) ("*Coalition II* "). Respondents have moved to dismiss that petition, and their motion currently is under submission before the Magistrate Judge.

continued military activity in Japan after Germany's surrender, but before Japan surrendered. The Military Commission sat in China with the consent of the Chinese government. After trial and conviction there, the prisoners were repatriated to Germany to serve their sentences in a prison whose custodian was an American Army officer. While in Germany, the petitioners filed a writ of habeas corpus claiming that their right under the Fifth Amendment to due process, other unspecified rights under the Constitution and laws of the United States and provisions of the Geneva Convention governing prisoners of war all had been violated. They sought the same relief as petitioners here: that they be produced before the federal district court to have their custody justified and then be released. They named as respondents the prison commandant, the Secretary of Defense and others in the civilian and military chain of command.

Reversing the Court of Appeals, the Supreme Court in *Johnson* upheld the district court's dismissal of the petition on the ground that petitioners had no basis for invoking federal judicial power in any district. In reaching that conclusion, the Supreme Court stated the following:

- "[T]he privilege of litigation has been extended to aliens, whether friendly or enemy, only because permitting their presence in the country implied protection. No such basis can be invoked here, for these prisoners at no relevant time were within any territory over which the United States is *sovereign* and the circumstances of

their offense [and] their capture ... were all beyond the territorial jurisdiction of any court of the United States."

. . . . .

- "A basic consideration in habeas corpus practice is that the prisoner will be produced before the court.... To grant the writ to these prisoners might mean that our army must transport them across the seas for hearing.... The writ, since it is ... [argued] to be a matter of right, would be equally available to enemies during active hostilities .... Such trials would hamper the war·effort .... It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home."

189 F.Supp.2d at 1046–47 (citations and footnotes omitted).

■ The effect of *Johnson* is that the Guantanamo detainees' ability to invoke jurisdiction in any district court "depends not on the nature of their claims but on whether the Naval Base at Guantanamo Bay is under the sovereignty of the United States." *Id.* at 1048–49. In *Coalition I*, this Court determined that the Naval Base is not within sovereign United States territory and that, as a result, no federal court would have jurisdiction to hear the petitioners' claims. *Id.* at 1049–50.[3] The Court reaches the same conclusion here.

3. This Court described the similarities between the petitioners in *Johnson* and the Guantanamo captives as follows: "In all key respects, the Guantanamo detainees are like the petitioners in *Johnson*. They are aliens; ... they were captured in combat; they were abroad when captured; they are abroad now; since their capture, they have been under the control of only the military; they have not stepped foot on American soil; and there are no legal or judicial precedents entitling them to pursue a writ of habeas corpus in an American civilian court. ·Moreover, there are sound practical reasons, such as legitimate

## B. Post-*Coalition I* Decisions

### 1. *The Ninth Circuit Decision in Co-alition I*

Although the Court of Appeals vacated this Court's rulings about *Johnson* and the sovereign status of Guantanamo, in its opinion the Ninth Circuit stated:

> There is no question that the holding in *Johnson* represents a formidable obstacle to the rights of the detainees at Camp X–Ray to the writ of habeas corpus; it is impossible to ignore, as the case well matches the extraordinary circumstances here.

*Coalition of Clergy v. Bush*, 310 F.3d at 1164 n. 4.

### 2. *Rasul v. Bush*

In *Rasul v. Bush*, 215 F.Supp.2d 55 (D.D.C.2002), the district court dismissed two cases brought by Guantanamo detainees. The court ruled that it did not have jurisdiction because Guantanamo "is outside the sovereign territory of the United States" and because, under *Johnson*, "writs of habeas corpus are not available to aliens held outside the sovereign territory of the United States." 215 F.Supp.2d at 72–73.

### 3. *Al Odah v. United States*

In *Al Odah v. United States*, 321 F.3d 1134 (D.C.Cir.2003), the Court of Appeals for the District of Columbia Circuit relied heavily on *Johnson* to affirm the district court's decision in *Rasul* and also to dismiss a third petition brought by the wife of an Australian citizen detained at Guantanamo. *Al Odah* rejects many of the arguments Petitioner makes here and describes the parallels between these cases and *Johnson* much as this Court did in *Coalition I*:

> [T]he Guantanamo detainees have much in common with the German prisoners in [*Johnson*]. They too are aliens, they too were captured during military operations, they were in a foreign country when captured, they are now abroad, they are in the custody of the American military and they have never had any presence in the United States.... [W]e believe that under [*Johnson*] these factors preclude the detainees from seeking habeas relief in the courts of the United States.

321 F.3d at 1140.

### 4. *Additional Post–Coalition I Decisions*

Perhaps because *Johnson* so well matches the "extraordinary circumstances" of recent events, *Coalition of Clergy*, 310 F.3d at 1164 n. 4, several courts have cited it in ruling on challenges to government action in the wake of September 11. In *Padilla v. Bush*, 233 F.Supp.2d 564, 608 (S.D.N.Y.2002), the district court ruled that the President could detain even an American citizen taken into custody on American soil if he had "some evidence" that the detainee was an "enemy combatant." The *Padilla* court quoted *Johnson*, 339 U.S. at 789, 70 S.Ct. 936, for the proposition that "it is not the function of the Judiciary to entertain private litigation ... which challenges the legality, [the] wisdom, or the propriety of the Commander–in–Chief in sending our armed forces abroad or to any particular region." 223 F.Supp.2d at 589.

The Fourth Circuit cited *Johnson* several times in its wide-ranging opinion in *Hamdi v. Rumsfeld*, 316 F.3d 450 (4th Cir.2003), including for the proposition

---

security concerns, that make it unwise for this or any court to take the unprecedented step of conferring such a right on these detainees." *Id.* at 1048.

This Court does not assume, and makes no finding, that Falen Gherebi is an "enemy combatant" or "enemy alien."

that responsibility for enforcing the predecessor to the current Geneva Convention rested with "political and military authorities," not the judiciary. 316 F.3d at 469 (quoting *Johnson,* 339 U.S. at 789 n. 14, 70 S.Ct. 936). *Hamdi* rejected a challenge to the continued detention of an American citizen captured in Afghanistan and transferred to a Virginia Naval Brig because it was not disputed that the detainee had been seized in a zone of active combat abroad and because the evidence proffered by the President was sufficient to establish that the detainee had been allied with enemy forces. 316 F.3d at 465, 474.

The Supreme Court also recently cited *Johnson,* although in a decision unrelated to the events of September 11. The Court quoted *Johnson* to emphasize that presence within this country's borders has traditionally afforded aliens certain constitutional protections not extended to noncitizens abroad:

> "The alien ... has been accorded a generous and ascending scale of rights as he increases his identity with our society.... [A]t least since 1886, we have extended to ... resident aliens important constitutional guarantees-such as the due process of law of the Fourteenth Amendment."

*Demore v. Kim,* —— U.S. ——, 123 S.Ct. 1708, 1730, 155 L.Ed.2d 724 (2003) (quoting *Johnson,* 339 U.S. at 763, 70 S.Ct. 936).

## C. Petitioner's Challenges to the Applicability of *Johnson*

Although Petitioner has not chosen to address these post-*Coalition I* cases in a new brief, he has argued that *Johnson* does not apply to the facts of this case.

### 1. *Guantanamo Is Not Sovereign United States Territory*

Petitioner first contends that *Johnson* cannot be applied to bar his claims because Falen Gherebi, unlike the *Johnson* prisoners, is being held within United States territory.

The question of Guantanamo's status is one of key importance because, as Justice Black noted in dissent, the *Johnson* majority relied entirely on the fact that the petitioners in that case had never been present in the United States to distinguish *Ex parte Quirin,* 317 U.S. 1, 63 S.Ct. 1, 87 L.Ed. 3 (1942) and *In re Yamashita,* 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499 (1946). *Johnson,* 339 U.S. at 780–81, 70 S.Ct. 936; *id.* at 795, 70 S.Ct. 936 (Black, J., dissenting). First, the Court stated that the *Johnson* prisoners had no right to habeas relief because they were "at no relevant time ... within any territory over which the United States is sovereign." 339 U.S. at 778, 70 S.Ct. 936. The Court again referred to sovereignty in explaining *Yamashita*'s inapplicability, nothing that the petitioner in that case had been able to invoke the Court's jurisdiction because he had been held within sovereign United States territory. *Id.* at 780, 70 S.Ct. 936. *See also United States v. Verdugo–Urquidez,* 494 U.S. 259, 269, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (citing *Johnson* for the proposition that aliens are not entitled "to Fifth Amendment rights outside the *sovereign* territory of the United States") (emphasis added); *Coalition of Clergy,* 310 F.3d at 1164 n. 4 (*Johnson* "held that the privilege of the writ of habeas corpus could not be extended to aliens held outside the *sovereign* territory of the United States.") (emphasis added).

It is this emphasis on sovereignty, taken together with the lease agreements governing Guantanamo, that is fatal to Petitioner's argument. *See* Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, T.S. No. 418 (6 Bevans 113) ("the 1903 Lease"); Relations with Cuba, May 9, 1934, U.S.-Cuba, T.S. No. 866 (6 Bevans 1161). Petitioner emphasizes that

for all practical purposes the United States controls Guantanamo, but such control does not establish sovereignty. *See Vermilya–Brown Co. v. Connell*, 335 U.S. 377, 390, 69 S.Ct. 140, 93 L.Ed. 76 (1948) (recognizing distinction between "sole power" and "sovereignty"); *Cuban Am. Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1425 (11th Cir.1995). And this Court has already concluded that under the 1903 Lease, Cuba, not the United States, is sovereign in Guantanamo Bay. *See Coalition I*, 189 F.Supp.2d at 1049–50. *See also Vermilya–Brown*, 335 U.S. at 380–83, 69 S.Ct. 140 (United States not sovereign over American military base in Bermuda, even though lease from Great Britain granted United States "substantially the same rights" as over Guantanamo Bay).

This dispositive distinction between "sovereign territory" and "complete jurisdiction and control" may appear technical (or at least elusive), but Petitioner's arguments provide no principled basis for this Court to disregard *Johnson*.

### 2. *A Formal Declaration of War is Not Required*

Petitioner next contends that *Johnson* is inapplicable because Falen Gherebi, unlike the *Johnson* prisoners, was not captured during a declared war.[4]

■ *Johnson* certainly did acknowledge the war-related circumstances of the German prisoners' capture. 339 U.S. at 771–72, 70 S.Ct. 936 ("It is war that exposes the relative vulnerability of the alien's status.... [D]isabilities this country lays upon the alien who becomes also an enemy are imposed temporarily as an incident of war and not as an incident of alienage."). *See also United States v. Bin Laden*, 132 F.Supp.2d 168, 182 n. 10 (S.D.N.Y.2001) (explaining that the *Johnson* prisoners

were a "specific kind of non-resident alien—'the subject of a foreign state at war with the United States'") (quoting *Johnson*, 339 U.S. at 769 n. 2, 70 S.Ct. 936); David Cole, Enemy Aliens, 54 Stan. L.Rev. 953, 984 (2002) ("[The] principles [of *Johnson*] apply only in a time of declared war to citizens of the country with which we are at war."). And Justice Jackson's opinion made it clear that the Court was unwilling to extend the "privilege of litigation" to the *Johnson* petitioners at least in part because that same privilege was not available to resident aliens subject to the Alien Enemy Act, 50 U.S.C. § 21. 339 U.S. at 775–76, 778, 70 S.Ct. 936. As Petitioner points out, the Alien Enemy Act is of no consequence here because that Act applies only during declared wars. 50 U.S.C. § 21. *See also Jaegeler*, 342 U.S. at 348, 72 S.Ct. 326.

Ultimately, however, Petitioner's argument is unpersuasive because *Johnson* focused on the practical realities, not legal formalities, of armed conflict. In denying the *Johnson* prisoners the "privilege of litigation," the Supreme Court emphasized that a contrary result would unreasonably hamper military efforts. *See* 399 U.S. at 779, 90 S.Ct. 2230. Even though "active hostilities" already had faded into a "twilight between war and peace," the Court worried that allowing access to the courts would "divert [the] efforts and attention [of field commanders] from the military offensive abroad to the legal defensive at home." *Id.* To limit the application of *Johnson* to those captured during formally declared wars would ignore this aspect of the Court's opinion and would deprive the decision of much of its rationale. *Cf. Verdugo–Urquidez*, 494 U.S. at 273–274, 110 S.Ct. 1056. ("The United States frequent-

---

4. The war with Germany was not declared over until October 19, 1951. Pub.L. No. 82–181, 65 Stat. 451. *See also United States ex*

*rel. Jaegeler v. Carusi*, 342 U.S. 347, 348, 72 S.Ct. 326, 96 L.Ed. 390 (1952) (per curiam).

ly employs Armed Forces outside this county ... for the protection of American citizens or national security.... Application of the Fourth Amendment to those circumstances could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest.") (citation omitted).

■ As the D.C. Circuit recently held in *Al Odah, Johnson* cannot be so limited. It applies to Falen Gherebi, just as it did to Al Odah, regardless of whether they are "within the category of 'enemy aliens,' at least as [*Johnson*] used the term." *Al Odah*, 321 F.3d at 1139–41.[5]

### 3. *Johnson Applies Even Though Petitioner Has Not Been Charged or Convicted*

Petitioner also argues that this case is distinguishable from *Johnson* because, unlike the *Johnson* prisoners, Falen Gherebi has not been charged or brought before a military commission.[6] Gherebi's detention presents more compelling due process violations, Petitioner contends, because it is preventive, not punitive, in nature. *See Zadvydas v. Davis*, 533 U.S. 678, 690–91, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (citing the very limited instances when preventive, potentially indefinite detention

has been upheld). To deprive Falen Gherebi of all judicial review would, according to Petitioner, raise "a serious constitutional problem." *Id.*, 533 U.S. at 690, 121 S.Ct. 2491. *Cf. also INS v. St. Cyr*, 533 U.S. 289, 298, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (noting the "longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction").

Petitioner claims to find support for his position in this quotation from *Johnson:* "[T]he doors of our courts have not been summarily closed upon these prisoners. Three courts have considered their application and have provided their counsel opportunity to advance every argument in their support ...." 339 U.S. at 780–781, 70 S.Ct. 936. But the quoted language refers to the three Article III courts that addressed the German prisoners' habeas petition, not to the military commission that had tried them. And while it is true no Guantanamo captive has yet been tried by *any* tribunal, it is also true that here, as in *Johnson*, Petitioner's jurisdictional arguments have been, and on appeal will be, given careful consideration.

As the D.C. Circuit recently explained in *Al Odah*, everything in *Johnson* "turned on the circumstances of those seeking re-

**5.** "[A]n enemy alien is the subject of a foreign state at war with the United States." *Johnson*, 339 U.S. at 769 n. 2, 70 S.Ct. 936.

**6.** In *Johnson*, the Supreme Court took care to note that the petitioners in that case had been "formally accused of violation of the laws of war and fully informed" of the charges against them. 339 U.S. at 786, 70 S.Ct. 936. That language is found in Part IV of the *Johnson* opinion, however, where the Court went on to consider the merits of the petitioners' claims. As noted by Justice Black in dissent, and by the D.C. Circuit in *Al Odah*, Part IV is "irrelevant" and "extraneous" to the *Johnson* Court's jurisdictional holding. *Johnson*, 339 U.S. at 792, 70 S.Ct. 936 (Black, J., dissenting); *Al Odah*, 321 F.3d at 1142.

Moreover, the Supreme Court referred to the charges leveled against the petitioners simply to explain why the military commission in China had not exceeded the scope of its authority; nothing about the Court's explanation suggests that the *Johnson* petitioners would have been granted access to civilian courts if (like Falen Gherebi) the petitioners had sought relief during the period between their capture and formal accusation or conviction. *See Johnson*, 339 U.S. at 786–87, 70 S.Ct. 936 (explaining that military commissions have jurisdiction to adjudicate charges that a captured detainee violated the laws of war).

lief, on the authority under which they were held, and on the consequences of opening the courts to them." 321 F.3d at 1145. To this Court it again appears, as it did in *Coalition I,* that with respect to Falen Gherebi "those circumstances, that authority, and those consequences differ in no material respect from" *Johnson. Id.*

### 4. *International Law*

Finally, Petitioner contends that his detention violates provisions of the International Covenant on Civil and Political Rights ("ICCPR"). Petitioner has not sought relief or stated a claim under that treaty, although he is correct to point out that a "clear international prohibition exists against prolonged and arbitrary detention." *Ma v. Ashcroft,* 257 F.3d 1095, 1114 (9th Cir.2001) (relying on the ICCPR) (internal quotation marks and citation omitted).

Because the application of international law to this case has not yet been carefully briefed, this Court will not rule on the parties' contentions except to note that several courts, including *Ma,* 257 F.3d at 1108, have cited *Johnson* as valid precedent in the years since ratification of the ICCPR. *See, e.g., Zadvydas,* 533 U.S. at 693, 121 S.Ct. 2491; *Verdugo–Urquidez,* 494 U.S. at 269, 110 S.Ct. 1056.

### D. If Petitioner Is Not Permitted Access To Federal Court, Does He Have *Any* Legal Rights?

In *Coalition I,* this Court observed that it was

> not holding that these prisoners have no right which the military authorities are bound to respect. The United States, by the [1949] Geneva Convention ... concluded an agreement upon the treatment to be accorded captives. These prisoners claim to be and are entitled to its protection. It is, however, the obvious scheme of the Agreement that re-

sponsibility for observance and enforcement of these rights is upon political and military authorities. Rights of alien enemies are vindicated under it only through protests and intervention of protecting powers as the rights of our citizens against foreign governments are vindicated only by Presidential intervention.

189 F.Supp.2d at 1050 (quoting *Johnson,* 339 U.S. at 789 n. 14, 70 S.Ct. 936). The Court went on to note that the President had "recently declared that the United States [would] apply the rules of the Geneva Convention to at least some of the detainees." *Id.* at 1050 n. 15.

On November 13, 2001, the President issued a Military Order titled "Detention, Treatment and Trial of Certain Non–Citizens in the War Against Terrorism." 66 Fed.Reg. 57833–57836 (Nov. 16, 2001). In that Order, the President stated that *ad hoc* military commissions might be convened to try the Guantanamo detainees.

A few months after the first detainees were brought to Guantanamo, the Department of Defense promulgated Military Commission Order No. 1: Procedures for Trials by Military Commissions of Certain Non–United States Citizens in the War Against Terrorism (March 21, 2002.), *available at* http://www.defenselink.mil/news/Mar2002/d20020321ord.pdf. Order No. 1 guarantees "inter alia, the presumption of innocence, the right against self-incrimination, burden of proof on the Government, the choice of civilian defense counsel to serve alongside military defense counsel, the right of cross-examination and presentation of proof by the defense and proof beyond a reasonable doubt." Ruth Wedgwood, "Al Qaeda, Terrorism, and Miliary Commissions," 96 Am. J. Int'l L. 328, 337 n. 35 (2002).

On April 30, 2003, more than 13 months after Military Commission Order No. 1

was promulgated, the Department of Defense published an eight part series of "Military Commission Instructions," which (among other things) specify the crimes (and the elements of those crimes) that the commissions will have jurisdiction to try, as well as the responsibilities of both military and civilian defense counsel. *See* Military Commission Instructions Nos. 1–8, *available at* http://www. defenselink.mil/news/May2003/b05022003_bt297-03.html.

More than 15 months have gone by since the United States placed Falen Gherebi and hundreds of other captured individuals into detention in Guantanamo. Not one military tribunal has actually been convened. Not one Guantanamo detainee has been given the opportunity to consult an attorney, has had formal charges filed against him or has been able contest the basis for his detention. It is unclear why it has taken so long for the Executive Branch to implement its stated intention to try these detainees. Putting aside whether these captives have a right to be heard in a federal civilian court—indeed, especially because it appears they have no such right—this lengthy delay is not consistent with some of the most basic values our legal system has long embodied.

To compound the problem, recently reports have appeared in the press that several of the detainees are only juveniles. *See, e.g.,* Richard A. Serrano, "Juveniles Are Among Cuba War Detainees," L.A. Times, April 23, 2003, at A13. This development has led some to resort to extreme hyperbole in calling for immediate remedies. *See, e.g.,* Jonathan Turley, "Appetite for Authoritarianism Spawns an American Gulag," L.A. Times, May 2, 2003, at B19.

Unfortunately, unless *Johnson* and the other authorities cited above are either disregarded or rejected, this Court lacks the power and the right to provide such a remedy. Perhaps a higher court will find a principled way to do so.

## CONCLUSION

For the foregoing reasons, the petition is DISMISSED.

IT IS SO ORDERED.