Falen GHEREBI, Petitioner–Appellant,

v.

George Walker BUSH; Donald H. Rumsfeld, Respondents–Appellees.

No. 03–55785.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 11, 2003.

Filed Dec. 18, 2003.

ties as much as one year before SSA received the letter.

Stephen Yagman, Marion R. Yagman, Joseph Reichmann, Kathryn S. Bloomfield, Yagman & Yagman & Reichmann & Bloomfield, Venice, CA, for Petitioner–Appellant.

Theodore Olson, Solicitor General, Paul Clement, Deputy Solicitor General, Washington, DC, for Respondents–Appellees.

Before REINHARDT, GRABER, Circuit Judges, and SHADUR, Senior District Judge.*

* The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

REINHARDT, Circuit Judge.

## I. BACKGROUND

This case presents the question whether the Executive Branch may hold uncharged citizens of foreign nations in indefinite detention in territory under the "complete jurisdiction and control" of the United States while effectively denying them the right to challenge their detention in any tribunal anywhere, including the courts of the U.S. The issues we are required to confront are new, important, and difficult.

In the wake of the devastating terrorist attacks on September 11, 2001, Congress authorized the President to

use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Authorization for Use of Military Force, Pub.L. No. 107-40, 115 Stat. 224 (2001). Pursuant to that authorization, the President sent U.S. forces to Afghanistan to wage a military operation that has been commonly termed—but never formally declared—a "war" against the Taliban government and the terrorist network known as Al Queda.

Starting in early January 2002, the Armed Forces began transferring to Guantanamo, a United States naval base located on territory physically situated on the island of Cuba,[1] scores of individuals who were captured by the American military

1. For convenience, we sometimes refer to Guantanamo Naval Base as "Guantanamo" and sometimes simply as "the Base."

during its operations in Afghanistan. The captured individuals were labeled "enemy combatants." Now, for almost two years, the United States has subjected over six hundred of these captives to indefinite detention,[2] yet has failed to afford them any means to challenge their confinement, to object to the failure to recognize them as prisoners of war, to consult with legal counsel, or even to advance claims of mistaken capture or identity. Despite U.S. officials' recent stated intention to move to begin a sorting of the detainees, electing which to release and which to try before military tribunals on criminal charges, and the administration's designation several months ago of six detainees (including two Britons and one Australian) deemed eligible for military trials, *see* Neil A. Lewis, *Red Cross Criticizes Indefinite Detention in Guantanamo*, N.Y. TIMES, Oct. 10, 2003, at A1, no military tribunal has actually been convened. Nor has a single Guantanamo detainee been given the opportunity to consult an attorney, had formal charges filed against him, or been permitted to contest the basis of his detention in any way. Moreover, top U.S. officials, including Secretary of Defense Rumsfeld, have made it clear that the detainees may be held in their present circumstances until this country's campaign against terrorism ends. *Id.* The administration has, under-standably, given no indication whether that event will take place in a matter of months, years, or decades, if ever.[3]

On January 20, 2002, a group of journalists, lawyers, professors, and members of the clergy filed a petition for habeas relief before the United States District Court for the Central District of California on behalf of the class of unidentified individuals detained involuntarily at Guantanamo. The petition named as respondents President Bush, Secretary Rumsfeld, and a number of military personnel. *See Coalition of Clergy v. Bush*, 189 F.Supp.2d 1036 (C.D.Cal.2002). After the district court dismissed the petition for lack of "next-friend" standing, or, alternatively, for lack of jurisdiction under *Johnson v. Eisentrager*, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), this court affirmed on the ground that petitioners lacked standing, but vacated the court's jurisdictional rulings regarding *Johnson*. *See Coalition of Clergy v. Bush*, 310 F.3d 1153 (9th Cir. 2002).

Following our decision, Belaid Gherebi filed an amended next-friend habeas petition in this Court, on behalf of his brother Faren, in which the standing issue is not present. In his February 2003 Amended Petition, Gherebi[4] alleged violations of the U.S. Constitution and the Third Geneva

---

2. Although there is a dearth of official reports as to the conditions at Guantanamo, there have been a number of newspaper stories reporting on the subject, including interviews with Afghani and Pakistani citizens released without the filing of charges. Some of the prisoners released have said that the uncertainty of their fate, combined with linguistic isolation from others with whom they could communicate, confinement in very small cells, little protection from the elements, and being allowed only one one-minute shower per week led a number of detainees to attempt suicide multiple times. *See* Carlotta Gall & Neil A. Lewis, *Threats and Responses: Captives; Tales of Despair from Guantanamo*, N.Y. TIMES, June 17, 2003, at A1; *see also* Neil A. Lewis, *Red Cross Criticizes Indefinite Detention in Guantanamo*, N.Y. TIMES, Oct. 10, 2003, at A1 (reporting that in 18 months, 21 detainees have made 32 suicide attempts, a high incidence which human rights groups attribute to the uncertainty of their situation).

3. *See* Neil A. Lewis, *U.S. Erecting a Solid Prison at Guantanamo for Long Term*, N.Y. TIMES, Oct. 23, 2003, at A20 (discussing the building of a hard-walled traditional prison as an acknowledgment that detainees from Afghanistan will be kept for years).

4. From here on, "Gherebi" refers to the detainee, Faren Gherebi, rather than to his brother and next friend, Belaid.

Convention arising out of his involuntary detention at Guantanamo, a naval base "under the exclusive and complete jurisdiction of the respondents," and he further claimed that, "Respondents have characterized Gherebi as an 'unlawful combatant,' and have denied him status as a prisoner of war, have denied him rights under the United States Constitution, ... have denied him access to the United States Courts," and have denied him access to legal counsel.[5] The government did not respond. Thereafter, Gherebi urged this Court to resolve the "threshhold question" of federal subject matter jurisdiction in a motion to grant his petition summarily.[6] At that point, the government moved to dismiss Gherebi's petition without prejudice to its being re-filed in the district court, or alternatively, to transfer it to the district court so that the district judge could decide the question of jurisdiction. A motions panel of this Court granted the government's request, transferring Gherebi's petition to the United States District Court for the Central District of California. After additional motions were filed

with the district court urging summary disposition of the jurisdictional question, that court issued a reasoned order on May 13, 2003 dismissing Gherebi's petition for lack of jurisdiction. *See Gherebi v. Bush,* 262 F.Supp.2d 1064 (C.D.Cal. 2003) (order dismissing petition for lack of jurisdiction). The court held that *Johnson v. Eisentrager* controlled and foreclosed jurisdiction over Gherebi's petition in any federal court because Guantanamo "is not within sovereign U.S. territory." *Id.* at 1070. In so holding, the court described its conclusion as "reluctant[ ]," *id.* at 1066, and expressed hope that "a higher court w[ould] find a principled way" to provide the remedy of habeas corpus. *Id.* at 1073.

On appeal before this Court, Gherebi argues that (1) the district court erred in holding that *Johnson v. Eisentrager* precludes the district courts of this nation from exercising jurisdiction over his petition; and (2) the District Court for the Central District of California has jurisdiction to hear the writ because the custodians of the prisoners are within the jurisdiction of the court. We agree with

---

**5.** The Petition read, in relevant part:

2. Beginning on or about January 11, 2002, and continuing to date, respondents under force of arms and involuntary brought to U.S. Naval Station, Guantanamo Bay, Cuba (hereinafter "GITMO"), under the exclusive and complete jurisdiction of respondents in the nation of Cuba, Gheredi, whom respondents captured in the nation of Afghanistan.

3. Gherebi continues to be held against his will, illegally, under force of arms, incommunicado, and in violation of the United States Constitution and the Third Geneva Convention, and he has been denied access to legal representatives.

4. Respondents have characterized Gherebi as an "unlawful combatant," and have denied him status as a prisoner of war, have denied him rights under the United States Constitution, and have denied him access to the United States Courts.

5. Gherebi is unlawfully detained.

6. Respondents are the persons who have illegal and exclusive custody of Gherebi.

**6.** In a memorandum filed with this Court, Gherebi stated:

What is sought by this petition is: acknowledgment that Gherebi is detained by respondents; that the reason for Gherebi's detention be stated; that Gherebi be brought physically before the court for a determination of his conditions of detention, confinement, and status, which conditions are contended to be in violation of the Due Process Clause of the Fifth and Fourteenth Amendments and the cruel and unusual punishment clause of the Eighth Amendment, and be ordered to be brought into compliance with those Amendments; that Gherebi be accorded his right under the Sixth Amendment of equal access to counsel; that Gherebi be released; and for any and all appropriate other and further action.

Gherebi on both points. In so holding, we underscore that the issue before us is not whether Gherebi's detention will withstand constitutional inquiry, but rather whether the courts of the United States are entirely closed to detainees held at Guantanamo indefinitely—detainees who would appear to have no effective right to seek relief in the courts of any other nation or before any international judicial body.

We recognize that the process due "enemy combatant" habeas petitioners may vary with the circumstances and are fully aware of the unprecedented challenges that affect the United States' national security interests today, and we share the desire of all Americans to ensure that the Executive enjoys the necessary power and flexibility to prevent future terrorist attacks. However, even in times of national emergency—indeed, particularly in such times—it is the obligation of the Judicial Branch to ensure the preservation of our constitutional values and to prevent the Executive Branch from running roughshod over the rights of citizens and aliens alike. Here, we simply cannot accept the government's position that the Executive Branch possesses the unchecked authority to imprison indefinitely any persons, foreign citizens included, on territory under the sole jurisdiction and control of the United States, without permitting such prisoners recourse of any kind to any judicial forum, or even access to counsel, regardless of the length or manner of their confinement. We hold that no lawful policy or precedent supports such a counter-intuitive and undemocratic procedure, and that, contrary to the government's contention, *Johnson* neither requires nor authorizes it. In our view, the government's position is inconsistent with fundamental tenets of American jurisprudence and raises most serious concerns under international law.[7]

7. Gherebi argues that the government's policy of "indefinite detention" is violative of international law. While we recognize the gravity of Gherebi's argument, we need not resolve that question in this proceeding. We note, however, that the government's position here is at odds with the United States' longtime role as a leader in international efforts to codify and safeguard the rights of prisoners in wartime. It is also at odds with one of the most important achievements of these efforts—the 1949 Geneva Conventions, which require that a competent tribunal determine the status of captured prisoners. Article 5 of the Third Geneva Convention provides:

Should any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy, belong to any of the categories enumerated in Article 4 [defining POWs], such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.

Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, art. 5, 6 U.S.T. 3316, 75 U.N.T.S. 135. In *Johnson v. Eisentrager*, itself, the Court discussed the United States' international obligations under the predecessor Convention, which did not even contain the due process rights afforded prisoners of war in the 1949 Treaty. The Court explained:

We are not holding that these prisoners have no right which the military authorities are bound to respect. The United States, by the Geneva Convention of July 27, 1927 ... concluded with forty-six other countries, including the German Reich, an agreement upon the treatment to be accorded captives. These prisoners claim to be and are entitled to its protection.

339 U.S. at 789 n. 14, 70 S.Ct. 936. The government's own regulations have adopted this same requirement. *See* Enemy Prisoners of War, Retained Personnel, Civilian Internees and Other Detainees, U.S. Army Regulation 190–8, ch. 1–5, ¶ a, Applicable to the Departments of the Army, the Navy, the Air Force, and the Marine Corps, Washington D.C. (Oct. 1, 1997) ("All persons taken into custody by U.S. forces will be provided with the protections of the 1949 Geneva Convention Relative to the Treatment of Prisoners of War ('GPW') until some legal status is determined by competent authority."). The requirement of judicial review of executive detention is also reflected in the International Covenant on Civil and Political Rights, to

Accordingly, we reverse the ruling of the district court that jurisdiction over Gherebi's habeas petition does not lie. Because we also conclude that personal jurisdiction may be asserted against respondent Rumsfeld in the Central District of California, we remand the matter to the district court for further proceedings consistent with this opinion. We do not resolve here, and leave to the district court to decide, the distinct and important question whether a transfer to a different district court may be appropriate under 28 U.S.C. § 1404(a).

## II. DISCUSSION

### A. *Johnson v. Eisentrager as a bar to jurisdiction*

To support its contention that habeas jurisdiction does not lie with respect to the Guantanamo detainees in the Central District or any other district court of the United States, the government relies primarily on *Johnson v. Eisentrager,* 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). *Johnson* involved a habeas petition by German enemy prisoners detained in Landsberg Prison, Germany, after being tried and sentenced to a fixed term of confinement by a U.S. Military Commission in Nanking, China for offenses committed in China subsequent to the unconditional surrender of Germany at the end of World War II. The Court declined to exercise jurisdiction, holding that the German national petitioners, tried in China for acts committed there, and confined to prison in Germany, had no right to seek a writ of habeas corpus in a United States court to test the legality of such detention. *Id.* at 790, 70 S.Ct. 936.

In connection with its holding, the Court discussed two factors: first, that the prisoners were "alien enemies" in a declared war, *see generally id.* at 769–776, 70 S.Ct. 936 (discussing the significance of alien enemy status and the reach of jurisdiction); and second, that the petitioners were detained outside "any territory over the which the United States is sovereign, and the scenes of their offense, their capture, their trial and their punishment were all beyond the territorial jurisdiction of any court of the United States." *Id.* at 777–78, 70 S.Ct. 936; *see generally id.* at 777–85, 70 S.Ct. 936 (discussing the significance of extraterritorial situs, or situs outside U.S. sovereign territory, and the reach of jurisdiction). The Court explained:

> We are cited to no instance where a court, in this or any other country where the writ is known, has issued it on behalf of an *alien enemy* who, at *no relevant time and in no stage of his captivity, has been within its territorial jurisdiction.* Nothing in the text of the Constitution extends such a right, nor does anything in our statutes.

399 U.S. at 768, 90 S.Ct. 2230 (emphasis added). The *Johnson* Court did not suggest that the mere "alien enemy" status of petitioners would be sufficient in itself for the denial of habeas jurisdiction; rather it

which the United States is a party. *See* International Covenant on Civil and Political Rights, Dec. 16, 1966, 999 U.N.T.S. 171, art. 9, ¶ 4 ("Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that a court may decide without delay on the lawfulness of his detention...."). Here, however, the government has maintained that the Guantanamo detainees do not enjoy any sub-stantive protections as a matter of right pursuant to our international obligations; instead, it has asserted only that it will apply "the principles" of the Third Geneva Convention "to the extent appropriate and consistent with military necessity." Office of the Press Secretary, Fact Sheet, Status of Detainees at Guantanamo, Feb. 7, 2002, at 1, *at* http://www.whitehouse.gov/news/releases/2002/02/20020207-13.html.

emphasized that in the case of alien enemies habeas is not available when their acts and the situs of their trial and detention all lie outside of this nation's territorial jurisdiction.[8]

The government contends that the exercise of habeas jurisdiction over Gherebi's petition is foreclosed by *Johnson* because the conditions that justified the Court's decision there apply equally to Gherebi and the other Guantanamo detainees. We may assume, for purposes of this appeal, that most, if not all of those being held at Guantanamo, including Gherebi, are the equivalent of "alien enemies," indeed "enemy combatants," although we do not foreclose here Gherebi's right to challenge the validity of that assumption upon remand. The dispositive issue, for purposes of this appeal, as the government acknowledges, relates to the legal status of Guantanamo, the site of petitioner's detention. It is our determination of that legal status that resolves the question regarding the dispositive jurisdictional factor: whether or not Gherebi is being detained within the territorial jurisdiction of the United States or within its sovereign jurisdiction, as the case may be.

On this appeal, the government does not dispute that if Gherebi is being detained on U.S. territory, jurisdiction over his habeas petition will lie, whether or not he is an "enemy alien." In *Ex parte Quirin*, 317 U.S. 1, 63 S.Ct. 1, 87 L.Ed. 3 (1942) and *In re Yamashita*, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499(1946), the Court reviewed the merits of the habeas petitions filed by enemy alien prisoners detained in U.S. sovereign (or then-sovereign) territory. In *Quirin*, the Court rejected on the merits the claim of enemy German petitioners held in Washington DC (and executed there) that the President was without statutory or constitutional authority to order them to be tried by a military commission for the offenses with which they were charged and had been convicted by the Commission; it then ruled that the Commission had been lawfully constituted and the petitioners lawfully tried and punished by it. 317 U.S. at 20–21, 63 S.Ct. 1. In *Yamashita*, the Court reviewed on the merits a similar World War II habeas claim on behalf of an enemy Japanese general, detained in the Philippines, which was U.S. territory at the time. Yamashita had already been tried, convicted, and sentenced to death by a military commission. Following *Quirin*, 317 U.S. at 7–9, 63 S.Ct. 1, the Court determined that the commission had been lawfully constituted, and that petitioner was lawfully detained pursuant to his conviction and sentence. *Id.* at 25–6, 63 S.Ct. 1. We need not resolve the question of what constitutional claims persons detained at Guantanamo may properly allege if jurisdiction to entertain habeas claims exists. Suffice it to say that if jurisdiction does lie, the detainees are not wholly without rights to challenge in habeas their indefinite detention without a hearing or trial of any kind, and the conditions of such detention.

## 1. *Territorial Jurisdiction and Sovereignty*

With respect to the Guantanamo detainees, the government contends that,

---

8. Although the Court discussed the question whether certain Fifth Amendment rights were available to enemy soldiers (and stated that they were not), the essence of its holding is as set forth above. Certainly, the government construes *Johnson* as foreclosing the right of enemy aliens to file habeas petitions in cases in which there is no relevant connection with U.S. territorial jurisdiction or sovereignty, as the case may be. We accept that construction for purposes of this appeal. We also believe it to be the most reasonable construction of the Court's decision. Whether that decision should stand is, of course, a matter for the Supreme Court and not for us.

under *Johnson,* the touchstone of the jurisdictional inquiry is *sovereignty*—not mere *territorial jurisdiction*—and that the United States does not maintain sovereignty over the territory at issue. Jurisdiction is foreclosed, the government argues, because although the 1903 Lease agreement (and the 1934 Treaty continuing the agreement ["the Lease and continuing Treaty"]) [9] which governs the terms of Guantanamo's territorial relationship to the United States cedes to the U.S. "complete jurisdiction and control" over the Base, it recognizes the "continuance of ultimate sovereignty" in Cuba. In other words, in the government's view, whatever the Lease and continuing Treaty say about the United States' complete *territorial jurisdiction,* Guantanamo falls outside U.S. *sovereign* territory—a distinction it asserts is controlling under *Johnson.*

Although we agree with the government that the outcome of the jurisdictional question in this case hinges on the legal status

9. The United States occupies Guantanamo under a lease entered into by President Theodore Roosevelt with the Cuban government in 1903, supplemented by a 1903 agreement, and continued in effect by a subsequent treaty executed by President Franklin Delano Roosevelt in 1934. The treaty is of indefinite duration and cannot be terminated without the United States' agreement, or the abandonment of the base property by the United States.

The 1903 Lease was meant to implement the provisions of Article VII of a 1901 Act of Congress (and of Article VII of the Appendix to the Constitution of Cuba) (the "Platt Amendment") providing for the sale or lease of land to the U.S. for coaling or naval stations "to enable the United States to maintain the independence of Cuba, and to protect the people thereof, as well as for its own defense" following the Spanish–American War. *See* Agreement Between the United States and Cuba for the Lease of Lands for Coaling and Naval Stations, Feb. 16–23, 1903, U.S.-Cuba, T.S. 418 (excerpting Article VII and explaining this purpose) [hereinafter "the 1903 Lease"]. Article III of the Lease reads, in pertinent part:

> While on the one hand the United States recognizes *the continuance of the ultimate sovereignty of the Republic of Cuba* over the above described areas of land and water, on the other hand the Republic of Cuba consents that during the period of the occupation by the United States of said areas under the terms of this agreement the *United States shall exercise complete jurisdiction and control* over and within said areas with the right to acquire ... for the public purposes of the United States any land or other property therein by purchase or by exercise

of eminent domain with full compensation to the owners thereof.

*Id.,* art. III (emphasis added).

Under a supplementary agreement, the United States was afforded the exclusive right to try citizens and non-citizens for crimes committed on the Base. Article IV reads, in relevant part:

> Fugitives from justice charged with crimes or misdemeanors amenable to Cuban Law, taking refuge within said areas, shall be delivered up by the United States authorities on demand by duly authorized Cuban authorities.
>
> *On the other hand, the Republic of Cuba agrees that fugitives from justice charged with crimes or misdemeanors amenable to United States law, committed within said areas, taking refuge in Cuban territory, shall on demand, be delivered up to duly authorized United States authorities.*

*See* Lease of Certain Areas for Naval or Coaling Stations, July 2, 1903, U.S.—Cuba, art. IV, T.S. No. 426 (emphasis added) [hereinafter "the 1903 Supplemental Agreement"]. Under Article I of the same, the U.S. agreed to pay Cuba the annual sum of two thousand dollars in rent, *see id.,* art. I; and under Article III, the United States agreed to a limit on establishing commercial or industrial enterprises on the lands. *Id.,* art. III.

A 1934 treaty reaffirmed the original 1903 agreements, extending the Lease in the same form and on the same conditions "[s]o long as the United States of America shall not abandon the said naval station of Guantanamo" and the two contracting parties do not "agree to the modification or abrogation of the stipulations of the agreement." Treaty Defining Relations with Cuba, May 29, 1934, U.S.—Cuba, art. III, 48 Stat. 1682, 1683, T.S. No. 866.

of the *situs* of Gherebi's detention, we do not read *Johnson* as holding that the prerequisite for the exercise of jurisdiction is *sovereignty* rather than *territorial jurisdiction.* Nor do we believe that the jurisdiction the United States exercised over Landsberg Prison in Germany is in any way analogous to the jurisdiction that this nation exercises over Guantanamo. When the *Johnson* petitioners were detained in Landsberg, the limited and shared authority the U.S. exercised over the Prison on a temporary basis nowhere approached the United States' potentially permanent exercise of complete jurisdiction and control over Guantanamo, including the right of eminent domain. The United States has exercised "complete jurisdiction and control" over the Base for more than one

century now, "with the right to acquire . . . any land or other property therein by purchase or by exercise of eminent domain with full compensation to the owners thereof." [10] We have also treated Guantanamo as if it were subject to American sovereignty: we have acted as if we intend to retain the Base permanently, and have exercised the exclusive, unlimited right to use it as we wish, regardless of any restrictions contained in the Lease or continuing Treaty.

When conducting its jurisdictional inquiry in *Johnson,* the Court spoke at different times of U.S. "territorial jurisdiction" and "sovereignty"—using the latter term on a minority of occasions [11] because it was indisputable that Landsberg Prison was *not* within either U.S. territorial jurisdiction or

---

**10.** There was no lease or treaty conveying total and exclusive U.S. jurisdiction and control over Landsberg. In fact, after Landsberg was taken over by U.S. forces following World War II, three flags flew over the town: the American, British, and French flags. *See* History of Landsberg Airbase, http://www.furstytreemovers-landsbergbavarians.org/ history_of_landsberg.htm (last visited Nov. 10, 2003). Although the *Johnson* petitioners were held pursuant to conviction by proceedings conducted under U.S. auspices, the Landsberg criminal facility was formally designated with the purpose of serving as a prison where executions of war criminals convicted during the *Allied* trials at Nuremberg, Dachau and Shanghi would be carried out, and the arrangement was dissolved a little more than a decade thereafter, in May 1958. *See* Landsberg Prison for War Criminals, http://www.buergervereinigung-landsberg.org/english/ warcriminals/warcriminals.shtml (last visited at Nov. 10, 2003). That the named respondents in *Johnson*—the Secretary of Defense, Secretary of the Army, Chief of Staff of the Army, and the Joint Chiefs of Staff—denied that petitioner's immediate custodian, the Commanding General of the European Command, "was subject to their direction," is telling of the less-than-exclusive nature of U.S. control over the prison. *Johnson,* 339 U.S. at 766–68, 70 S.Ct. 936.

**11.** The Court spoke to the issue of the extraterritorial situs of petitioners in eight instances in the opinion; at only two of these points does the term "sovereign" or "sovereignty" appear. *See, e.g.,* 339 U.S. at 768, 70 S.Ct. 936 ("We are cited to no instance where a court, in this or any other country where the writ is known, has issued it on behalf of an alien enemy who, at no relevant time and in no stage of his captivity, has been within its *territorial jurisdiction.*") (emphasis added); *id.* at 771, 70 S.Ct. 936 ("But in extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien's presence within its *territorial jurisdiction* that gave the Judiciary power to act.") (emphasis added). Moreover, the dissent never uses the word "sovereignty" and strongly criticizes the majority for making "territorial jurisdiction" the touchstone of the jurisdictional inquiry. *See id.* at 952 (Black, J., dissenting) ("Conceivably a majority may hereafter find citizenship a sufficient substitute for *territorial jurisdiction* and thus permit courts to protect Americans from illegal sentences. But the Court's opinion inescapably denies courts power to afford the least bit of protection for any alien who is subject to our occupation government abroad, even if he is neither enemy nor belligerent and even after peace is officially declared.") (emphasis added).

U.S. sovereign territory. The only question for the *Johnson* Court was whether it could exercise jurisdiction over petitioners' habeas claims in light of the fact that they were being detained on foreign ground that was not, under any recognized legal standard, treated as American territory. And while the Court expressly distinguished *Yamashita* on the basis that the United States possessed "*sovereignty* at this time over these insular possessions," (the Philippines), the Court nowhere suggested that "sovereignty," as opposed to "territorial jurisdiction," was a necessary factor. In fact, immediately following this statement, the Court specifically noted *three* "heads of jurisdiction" that petitioners might have invoked, none of which used the term "sovereignty" and all of which referred instead to "territory":

> Yamashita's offenses were committed on our *territory*, he was tried within the *jurisdiction* of our insular courts and he was imprisoned within *territory* of the United States. *None of these heads of jurisdiction can be invoked by these prisoners.*

*Id.* at 780, 70 S.Ct. 936 (emphasis added). Accordingly, *Johnson* in no way compels the conclusion that, where the U.S. exercises "territorial jurisdiction" over a situs, that degree of territorial authority and control is not sufficient to support habeas jurisdiction. To the contrary, it strongly implies that territorial jurisdiction *is* sufficient. In short, we do not believe that *Johnson* may properly be read to require "sovereignty" as an essential prerequisite of habeas jurisdiction.[12] Rather territorial jurisdiction is enough.

■ It is evident that the United States exercises sole territorial jurisdiction over Guantanamo. "Territorial jurisdiction" exists as to "territory over which a govern-

---

**12.** At least two Justices of the current Court appear to agree. *See Zadvydas v. Davis*, 533 U.S. 678, 704 n. *, 121 S.Ct. 2491 (2001) (Scalia, J., dissenting) (stating, in a dissent joined by Justice Thomas, that *Johnson* involved the "military's detention of enemy aliens outside the *territorial jurisdiction* of the United States") (emphasis added).

That *Johnson* should not be read to foreclose jurisdiction where the United States exercises exclusive authority and control is bolstered by Justice Jackson's own dissent several years later in *Shaughnessy v. U.S. ex. rel. Mezei*, 345 U.S. 206, 218, 73 S.Ct. 625, 97 L.Ed. 956 (1953), in which the author of the *Johnson* majority opinion expressed strong views about the requisites of procedural due process where an alien was detained indefinitely on a unique parcel of U.S. territory, "in his temporary haven on Ellis Island." *Id.* at 207, 73 S.Ct. 625. In *Shaughnessy*, an alien immigrant permanently excluded from the United States on security grounds, and functionally detained indefinitely on Ellis Island because other countries would not take him back, petitioned for habeas corpus asserting unlawful confinement. The majority treated his case like a regular exclusion proceeding, and de-

nied Mezei's petition. In vigorous dissent, Justice Jackson wrote:

> Fortunately, it is still startling, in this country, to find a person held indefinitely in executive custody without accusation of a crime or judicial trial ... Procedural fairness and regularity are of the indispensable essence of liberty ... Because the respondent has no right of entry, does it follow that he has no rights at all? Does the power to exclude mean that exclusion may be continued or effectuated by any means which happen to seem appropriate to the authorities? ... when indefinite confinement becomes the means of enforcing exclusion, it seems to me that due process requires that the alien be informed of its grounds and have a fair chance to overcome them ... It is inconceivable to me that this measure of simple justice and fair dealing would menace the security of this country. No one can make me believe that we are that far gone.

*Id.* at 632–37. Although the legal status of Guantanamo is not as clear-cut as that of Ellis Island, the eloquent words of *Johnson's* author carry a powerful message for the present case and caution strongly against a narrow reading of his earlier decision.

ment or a subdivision thereof, or court, has jurisdiction." *See* BLACK'S LAW DICTIONARY 1473 (6th ed.1990). The U.S. government exercises the "power to proscribe, prescribe, adjudicate, and enforce the law" in Guantanamo, *see New Jersey v. New York*, No. 120, 1997 WL 291594, at \* 28 (1997), *received at* 520 U.S. 1273, *and reviewed at* 523 U.S. 767, 118 S.Ct. 1726, 140 L.Ed.2d 993 (1998) (describing the "natural and ordinary meaning of 'jurisdiction' "), and further, the government's jurisdiction is both "complete," *see* 1903 Lease, art. III, *supra* note 9, and exclusive, *see* 1903 Supplemental Agreement, art. IV, *id.* (providing that U.S. courts exercise exclusive criminal jurisdiction over citizens and aliens, alike, for offenses committed on the Base). *See also* 6 Op. Off. Legal Counsel 236, 242 (1982) (opinion of then Asst. Attorney General Ted Olsen) (concluding that Guantanamo falls within "exclusive United States' jurisdiction," "because of the lease terms which grant the United States 'complete jurisdiction and control over' that property"). Where a nation exercises "exclusive jurisdiction" over a territory, territorial jurisdiction lies. *See U.S. v. Corey*, 232 F.3d 1166, 1172–76 (9th Cir. 2000) (examining a provision of a congressional act that defined territorial jurisdiction to include territory within the "exclusive jurisdiction" of the United States).

■ Here, the relationship between territorial jurisdiction and the right to file habeas petitions is particularly clear. The United States exercises exclusive criminal jurisdiction over all persons, citizens and aliens alike, who commit criminal offenses at the Base, pursuant to Article IV of the Supplemental Agreement. *See supra* note 9. We subject persons who commit crimes at Guantanamo to trial in United States courts.[13] Surely, such persons enjoy the right to habeas corpus in at least some respects. Under these circumstances, for purposes of our jurisdictional inquiry, it is apparent that the United States exercises exclusive territorial jurisdiction over Guantanamo and that by virtue of its exercise of such jurisdiction, habeas rights exist for persons located at the Base. We reiterate that the essence of our inquiry involves the legal status of the situs of petitioner's detention—not the question whether "enemy combatants" in general are precluded from filing habeas petitions, or the question whether any particular constitutional issues may be raised. The first of these questions is answered by *Quirin* and *Yamashita* and the second is not before us.

In sum, we conclude that by virtue of the United States' exercise of territorial jurisdiction over Guantanamo, habeas ju-

13. For example, in *United States v. Rogers*, 388 F.Supp. 298, 301 (E.D.Va.1975), a U.S. civilian employee, working on the Naval Base at Guantanamo Bay under a contract with the Navy, was prosecuted in the Eastern District of Virginia for drug offenses committed on the Base in violation of *21 U.S.C. §§ 841, 846*. In considering Rogers' motion to suppress and Fourth Amendment claim, the court reasoned:

> By the lease, Cuba agreed that the United States should have complete control over criminal matters occurring within the confines of the base. It is clear to us that under the leasing agreement, United States law is to apply.

*Id. See also United States v. Lee*, 906 F.2d 117, 117 & n. 1 (4th Cir.1990) (per curiam) (appeal from dismissal of indictment of Jamaican national who had been charged with sexual abuse that allegedly occurred on Guantanamo. The government served subpoenas on all defense witnesses and transported them to Norfolk, Virginia, the site of the trial.); *Haitian Ctrs. Council Inc. v. McNary*, 969 F.2d 1326, 1342 (2d Cir.1992), *vacated as moot sub. nom. Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 918, 113 S.Ct. 3028, 125 L.Ed.2d 716 (1993) (describing testimony, in the context of this Second Circuit trial, consistent with applying U.S. criminal law to citizens and non-citizens accused of crimes on the Base).

risdiction lies in the present case.[14] Although our conclusion is dispositive of the principal issue before us, we also consider an alternative ground for our holding: whether the U.S. exercises sovereignty over Guantanamo.

### 2. Sovereignty and the 1903 Lease and Continuing Treaty of 1934

■ Even if we assume that *Johnson* requires sovereignty, our decision that habeas jurisdiction lies is the same. In this regard, we conclude that, at least for habeas purposes, Guantanamo is a part of the sovereign territory of the United States. Both the language of the Lease and continuing Treaty and the practical reality of U.S. authority and control over the Base support that answer. Moreover, the present case is far more analogous to *Yamashita* than to *Johnson:* here, like in *Yamashita* but contrary to the circumstances in *Johnson*, the United States exercises total dominion and control over the territory in question and possesses rights of eminent domain, powers inherent in the exercise of sovereignty, while Cuba retains simply a contingent reversionary interest that will become effective only if and when the United States decides to relinquish its exclusive jurisdiction and control, i.e. sovereign dominion, over the territory. Thus, we hold that the prerequisite to the exercise of habeas jurisdiction is met in the case of Guantanamo, whether that prerequisite be "territorial jurisdiction" or "sovereignty."

---

14. In *Al Odah v. United States*, 321 F.3d 1134 (D.C.Cir.2003), *cert. granted*, —— U.S. ——, 124 S.Ct. 534, 157 L.Ed.2d 407, 2003 WL 22070725 (Nov. 10, 2003), the only other Court of Appeals decision to consider the question presented here, the DC Circuit rejected petitioners' arguments that *Johnson* "does not turn on technical definitions of sovereignty or territory," and opined that the text of the leases shows that Cuba—not the United States—has sovereignty over Guantanamo. 321 F.3d at 1142–43. In so holding, the DC Circuit relied in part on *Cuban Am. Bar Ass'n v. Christopher*, 43 F.3d 1412 (11th Cir.1995), in which the Eleventh Circuit rejected the argument that " 'control and jurisdiction' is equivalent to sovereignty," *id.* at 1425, to find that Cuban and Haitian migrants interdicted on the seas and detained outside the physical borders of the United States at Guantanamo were without constitutional and statutory rights cognizable in the courts of the United States.

The Second Circuit, however, expressed a contrary view three years before *Cuban American*. In *Haitian Ctrs.*, 969 F.2d at 1341–45, the Second Circuit affirmed a preliminary injunction prohibiting the government from returning to Haiti Haitian nationals interdicted at sea and detained at Guantanamo in the absence of a fair adjudication as to whether they were bonafide asylees. In its opinion, the court expressly distinguished *Johnson*, noting that *Johnson*, "which involved convicted, enemy aliens in occupied territories outside the United States," does not resolve the question of whether "the fifth amendment applies to non-accused, non-hostile aliens held incommunicado on a military base within the exclusive control of the United States, namely Guantanamo Bay." 969 F.2d at 1343. The Second Circuit further explained:

> It does not appear to us to be incongruous or overreaching to conclude that the United States Constitution limits the conduct of United States personnel with respect to officially authorized interactions with aliens brought to and detained by such personnel on a land mass exclusively controlled by the United States ... given the undisputed applicability of federal criminal laws to incidents that occur there and the apparent familiarity of the governmental personnel at the base with the guarantees of due process, fundamental fairness and humane treatment which this country purports to afford to all persons.

*Id.* Although *Haitian Centers* was subsequently vacated as moot pursuant to party settlement, *see Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 918, 113 S.Ct. 3028, 125 L.Ed.2d 716 (1993), we find the Second Circuit's views to be persuasive, *see Edwards v. Madigan*, 281 F.2d 73, 78 n. 3 (9th Cir.1960), and have, in fact, recently cited this case with approval. *See Corey*, 232 F.3d at 1172.

We now turn to an analysis of the term "sovereignty" and its application, for purposes of habeas, to the United States' role at Guantanamo. The government argues that, under the plain terms of the Lease, the "continuance" of Cuba's "ultimate" sovereignty means that Cuba retains "maximum" or "definitive" sovereignty over the Base during the indefinite period of U.S. reign, and consequently, that Guantanamo cannot be classified as U.S. sovereign territory for the purposes of our jurisdictional inquiry. The government's assertion requires us to consider whether "ultimate" is to be construed as a "temporal" or a "qualitative" modifier. In other words, does the Lease (and the 1934 continuing Treaty) vest sovereignty in Cuba "ultimately" in the sense that Cuba's sovereignty becomes substantively effective if and when the United States decides to abandon its physical and absolute control of the territory (or to put it differently, is Cuba's sovereignty residual in a *temporal* sense); or does the Lease (and the continuing Treaty) vest "basic, fundamental" or "maximum" (the alternative *qualitative* meaning of "ultimate" discussed *infra*) sovereignty in Cuba at all times, and specifically *during the indefinite period* in which the United States maintains complete jurisdiction and control over the Base? We conclude that, as used in the Lease, "ultimate sovereignty" can only mean temporal and not qualitative sovereignty. We also conclude that, during the unlimited and potentially permanent period of U.S. possession and control over Guantanamo, the United States

possesses and exercises all of the attributes of sovereignty, while Cuba retains only a residual or reversionary sovereignty interest, contingent on a possible future United States' decision to surrender its complete jurisdiction and control.[15]

"Ultimate" is defined principally in temporal, not qualitative, terms. *Black's Law Dictionary* defines "ultimate" to mean:

> At last, finally, at the end. The last in the train of progression or sequence tended toward by all that precedes; arrived at as the last result; final.

BLACK'S LAW DICTIONARY 1522. Similarly, *Webster's Third New International's* first two definitions state:

> *ultimatus* completed, last, final
>
> 1a: most remote in space or time: farthest, earliest . . .
>
> 2a: tended toward by all that precedes: arrived at as the last result . . .

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2479 (1976). *Webster's* then gives as the less-frequently used meaning the definition urged here by the government:

> 3a: basic, fundamental, original, primitive . . .
>
> 4: maximum

*Id.*

The primary definition (including *Webster's* first and second meanings) dictates a construction of the Lease under which sovereignty reverts to Cuba if and when the United States decides to relinquish control. Therefore, under that definition, the United States enjoys sovereignty during the period it occupies the territory. Adopting

---

15. A former Commander of the Base has expressed the same view of U.S. sovereign authority in Guantanamo in his history of the Naval Base, posted on the U.S. Navy's official website. He writes:

[T]he U.S. has recognized "the continuance of the ultimate sovereignty of Cuba over and above the leased areas." "Ultimate," meaning final or eventual, is a key word here. It is interpreted that Cuban sovereignty is interrupted during the period of our occupancy, since we exercise complete jurisdiction and control, but in the case occupation were terminated, the area would revert to the ultimate sovereignty of Cuba.

THE HISTORY OF GUANTANAMO BAY, vol. I, ch. III, *at* http://www.nsgtmo.navy.mil/gazette/History_98–64/hischp3.htm (last visited Nov. 10, 2003).

the alternative qualitative construction (*Webster's* third and fourth meanings, and the government's proffered definition) would render the word "ultimate" wholly superfluous. If the Lease vests sovereignty in Cuba during the indefinite period as to which it has ceded to the U.S. "complete jurisdiction and control," nothing would be added to the use of the term "sovereignty" by employing a modifier describing sovereignty as "basic, fundamental" or "maximum." If the government's understanding of ultimate were correct, no sovereignty would vest in the United States at any time and all sovereignty would vest in Cuba at all times with or without the use of the word "ultimate." In such circumstance, a simple statement that Cuba retains sovereignty would suffice. In contrast, construing "ultimate" to mean "last, final" or "arrived at as the last result," or in practical terms a reversionary right if and when the lease is terminated by the United States, serves to define the nature of Cuban sovereignty provided for under the Lease and gives meaning and substantive effect to the term "ultimate." Under the preferred construction of "ultimate," the use of that term in the Lease establishes the temporal and contingent nature of Cuba's sovereignty, specifying that it comes into being only in the event that the United States abandons Guantanamo: in such case, Guantanamo reverts to Cuba and to Cuban sovereignty rather than being subject to some other actual or attempted disposition. Most important, under the preferred temporal construction, Cuba does not retain any substantive sovereignty during the term of the U.S. occupation, with the result that, during such period, sovereignty vests in the United States. This Court's duty to give effect, where possible, to every word of a treaty, *see United States v. Menasche,* 348 U.S. 528, 538–539, 75 S.Ct. 513, 99 L.Ed. 615 (1955), should make us reluctant to deem treaty terms, or terms used in other important international agreements, as surplusage. *See Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001). This is especially the case when a term occupies a pivotal place in a legal scheme, *id.,* as does the word "ultimate" in Article III of the 1903 Lease. In construing the Lease and continuing Treaty, we adopt the primary, temporal definition of the term, as used in the English language—a term that gives its use as a modifier substantive meaning.[16]

---

**16.** The government also argues that the definition of this pivotal term in the Spanish version of the Treaty (*soberania "definitiva"*) lends support for a qualitative construction of "ultimate." The government defines *"definitiva"* as *"que no admite cambios"* or "not subject to change," and then contends, relying on *U.S. v. Percheman,* 32 U.S. (7 Pet.) 51, 88, 8 L.Ed. 604 (1833), that " 'ultimate' itself is more naturally defined in this context as 'basic, fundamental, original, primitive.' " It is this definition, the government argues, that best comports with *Percheman's* doctrine that "if the English and Spanish parts can, without violence, be made to agree, that construction which establishes this conformity ought to prevail." 32 U.S. at 88.

The government's construction inverts the conclusion that the *Percheman* doctrine compels. In fact, the Spanish definition of this pivotal term offers further support for a temporal construction of "ultimate." *"Definitiva"* can mean *either* 1) final; that which concludes ("temporal") *or* 2) decisive ("qualitative"), but even where *"definitiva"* is defined in qualitative terms, it always has a temporal element. For example, the authoritative dictionary of the Spanish language defines *"definitiva"* in both temporal and qualitative terms as *"que decide, resuelve o concluye,"* or "that which decides, resolves, or concludes" (emphasis added). *See* REAL ACADEMIA ESPANOLA, *at* http://www.rae.es/ (last visited Nov. 10, 2003). To illustrate a common usage of the term, this dictionary then offers the oft-cited *mixed* "temporal"/ "qualitative" example of *"sentencia definitiva"* or "final judgment of conviction"—a judgment that is *both* final *and* decisive; a judgment that is both last in time and that constitutes the dispositive order. *Id.; see also* GRAN DIC-

That the Lease uses the word "continuance" to describe Cuba's "ultimate sovereignty" does nothing to undercut the temporal construction of "ultimate." As we have explained, during the period the United States exercises dominion and control, i.e. sovereignty, over Guantanamo, Cuba retains a contingent sovereign interest—a reversionary right that springs into being upon a lawful termination of the U.S. reign. It is this reversionary interest that is "continued" even as substantive (or qualitative) sovereignty is ceded to the United States. In effect, the lease functions not unlike a standard land disposition contract familiar in the area of property law, in which the partitioning of a bundle of rights into present and future interests is commonplace.[17]

Finally, the term "ultimate" sovereignty must be construed in context. It is clearly the temporal definition of "ultimate," not its qualitative counterpart, that most naturally and accurately describes the nature of Cuban sovereignty in Guantanamo. By the plain terms of the agreement, the U.S. acquires full dominion and control over Guantanamo, as well as the right to purchase land and the power of eminent domain. Until such time as the United States determines to surrender its rights, it exercises full and exclusive executive, legislative and judicial control over the territory, and Cuba retains no rights of any kind to do anything with respect to the Base.[18] If "ultimate" can mean either "final" (temporal) or "basic, fundamental, and maximum" (qualitative), given that Cuba does not under the agreement retain *any*

---

CIONARIO LAROUSSE 214 (2002) (giving as an example for *"definitiva"* another mixed "temporal"/"qualitative" example, *"El proyecto definitivo,"* translated as "the final plan."). Other Spanish dictionaries confirm that *"definitiva"* is subject to both temporal and qualitative meanings, *see, e.g.,* DICCIONARIO VOX, *at* http://www.diccionarios.com (last visited Nov. 10, 2003) (defining *"definitiva"* as *"que decide o concluye,"* or, "that which decides or concludes"), and Spanish–English dictionaries also support a dual temporal/qualitative definition. *See* LAROUSSE DICTIONARY 84 (1989) (defining *"definitiva"* in English as "definitive; final"); AMERICAN HERITAGE SPANISH DICTIONARY, *at* http://education.yahoo.com/reference/dict_en_es/ (last visited Nov. 10, 2003) (same). Thus, under *Percheman's* doctrine, the analysis is formulaic and the answer evident: because the English word "ultimate" is principally defined in temporal terms, and the Spanish term *"definitiva"* is susceptible to either temporal or qualitative definitions, or a mixed definition, it is the temporal definition that prevails.

17. The division or sharing of sovereignty is commonplace. Sovereignty "is not an indivisible whole[.]" WEBSTER'S THIRD NEW INTERNATIONAL 2179 (defining "sovereignty"). *See also Jones v. U.S.,* 137 U.S. 202, 212, 11 S.Ct. 80, 34 L.Ed. 691 (1890) (recognizing a dis-

tinction between *de jure* and *de facto* sovereignty).

18. To the extent that the Lease purported to limit the types of activities the U.S. may conduct, that particular aspect of the agreement lost any and all practical and legal significance when the U.S. ceased to recognize Cuba diplomatically in 1961, and began thereafter to act in direct contravention of the terms of the agreement, up to and including the present use of Guantanamo as a prisoner of war camp for suspected Taliban fighters. *See infra* Part II(A)(3). In any event, even while effective, the limitation did not curtail the United States' exclusive authority and control over the Base, serve to reserve qualitative sovereignty to Cuba during the period of U.S. occupation, or afford any rights to Cuba to exercise any jurisdiction during the unlimited period of U.S. dominion and control. *See, e.g.,* 29 Op. Att'y Gen. 269, 270–71 (1911) ("[W]hen property is acquired by one state in another state by virtue of a treaty, any sovereignty which may attach to the property so acquired is limited by the terms on which, and the purposes for which, the property was acquired ... There seems to be nothing in reason or in law which prohibits such a situation.").

degree of control or jurisdiction over Guantanamo during the period of United States occupation, the use of the term "ultimate" as a modifier of "sovereignty" in that agreement can *only* mean "final" (temporal) and not "basic, fundamental, and maximum" (qualitative). Accordingly, we conclude that the Lease and continuing Treaty must be construed as providing that Cuba possesses no substantive sovereignty over Guantanamo during the period of the U.S. reign. All such sovereignty during that indefinite and potentially permanent period is vested in the United States.

### 3. *Conduct of the Parties Subsequent to the Lease and Continuing Treaty*

There is another consideration that militates in favor of our concluding that the United States is presently exercising sovereignty over Guantanamo. For a considerable period of time, our government has purposely acted in a manner directly inconsistent with the terms of the Lease and continuing Treaty. Those agreements limit U.S. use of the territory to a naval base and coaling station. Contrary to the relevant provisions of the agreements, the United States has used the Base for whatever purposes it deemed necessary or desirable. Cuba has protested these actions in public fora and for years has refused to cash the United States' rent checks. *See* Center for International Policy's Cuba Project, Statement by the Government of Cuba to the National and International Public Opinion (Jan. 11, 2002), *at* http://ci-ponline.org/cuba/cubaproject/cubanstatement.htm (last visited Nov. 10, 2003). At the same time, the Cuban government has admitted that it is powerless to prevent U.S. uses that conflict with the terms of the Lease and continuing Treaty.[19] *Id.*

 Sovereignty may be gained by a demonstration of intent to exercise sovereign control on the part of a country that is in possession of the territory in question and that has the power to enforce its will. *See United States v. Rice,* 17 U.S. (4 Wheat.) 246, 254, 4 L.Ed. 562 (1819) (hostile occupation gives "firm possession" and the "fullest rights of sovereignty" to the occupying power, while suspending the sovereign authority of the land whose territory is being occupied); *Cobb v. U.S.,* 191 F.2d 604, 608 (9th Cir.1951) (an occupying power may acquire sovereignty through an act of formal annexation or "an expression of intention to retain the conquered territory permanently"); *see also Fleming v. Page,* 50 U.S. (9 How.) 603, 614, 13 L.Ed. 276 (1850) (the U.S. had "sovereignty and dominion" over the occupied Mexican territory, where "the country was in the exclusive and firm possession of the U.S., and governed by its military authorities acting under the orders of the President"). *Cf. Neely v. Henkel,* 180 U.S. 109, 119, 21 S.Ct. 302, 45 L.Ed. 448 (1901) (where the occupation policy expressly disavows "exercise of sovereignty, jurisdiction, or control" over the occupied area, and is aimed at the establishment of a government to which the area may be restored, this occupied territory is considered "foreign"). With respect to Guantanamo, the sover-

---

**19.** In a January 11, 2002 statement issued to the international community as the detainees were arriving at Guantanamo, the Cuban government lamented the unfair conditions imposed by the Treaty and its powerlessness to stop U.S. transgressions. The Statement reads, in part:

> [T]hroughout more than four decades, that base has been put to multiple uses, none of them contemplated in the agreement that justified its presence in our territory. But Cuba could do absolutely nothing to prevent it[.]

Statement by the Government of Cuba to the National and International Public Opinion, *at* http://ciponline.org/cuba/cubaproject/cuban-statement.htm.

eign face of U.S. authority and power has taken shape in recent decades. It has emerged, practically, through the concrete actions of a powerful nation intent on enforcing the right to use the territory it occupies without regard to any limitations. Whatever question may have existed about our sovereignty previously, our insistence on our right to use the territory for any and all purposes we desire, and our refusal to recognize the specific limitation on our rights provided in the Lease and continuing Treaty, removes any doubt that our sovereignty over Guantanamo is complete.

The United States originally leased the Base, pursuant to the 1903 agreement, for use as a naval and coaling station. *See* 1903 Lease, *supra* note 9. Base relations remained stable through the two world wars, but after the United States terminated diplomatic relations with Cuba in 1961, following the Cuban revolution, the United States began to use the base for purposes contrary to the terms of the agreement. *See* Guantanamo Bay, A Brief History, *at* http://www.nsgtmo.navy.mil/Default.htm (last visited Nov. 10, 2003). At the same time, many citizens of the host country sought refuge on the Base, and U.S. Marines and Cuban militiamen began patrolling opposite sides of the Base's fence line—patrols that have continued 24 hours a day ever since. *Id.* In 1964, Fidel Castro cut off water and supplies to the Base and Guantanamo became and remains entirely self-sufficient, with its own water plant, schools, transportation, entertainment fa-

cilities, and fast-food establishments. *See* Gerald Neuman, *Anomalous Zones*, 48 STAN. L.REV. 1197, 1198 (1996). As of 1988, approximately 6,500 people lived on the Base, including civilian employees of several nationalities, *see id.* (describing the findings of one researcher), and the United States has employed hundreds of foreign nationals at Guantanamo, including Cuban exiles and Jamaicans. *Id.* at 1128. Today, the Base is in every way independent of Cuba and in no way reliant on Cuba's cooperation.

The United States' refusal to limit its dominion and control to the use permitted by the Lease and continuing Treaty became more pronounced in the 1990's, when President Clinton used the Base as a detention facility for approximately 50,000 Haitian and Cuban refugees intercepted at sea trying to reach the United States for refuge.[20] *See* Laura Bonilla, *Afghan War Prisoners in Guantanamo*, AGENCE FRANCE-PRESSE, Dec. 29, 2001, *available at* 2001 WL 25095452. In 1999, President Clinton again proposed using the Base in a manner not authorized by the terms of the lease—this time to house 20,000 refugees from Kosovo. *See* Philip Shenon, *U.S. Chooses Guantanamo Bay Base in Cuba for Refugee Site*, N.Y. TIMES, Apr. 7, 1999, at A13. Although, in the end, this plan was not implemented, the earlier actions only foreshadowed the 2002 arrival of over 600 individuals alleged to be members of Al-Queda or the Taliban, who were transported to Guantanamo by the U.S. military for

---

**20.** The U.S. Navy's official website explains:

> In 1991, the naval base's mission expanded as some 34,000 Haitian refugees passed through Guantanamo Bay ... In May 1994, Operation Sea Signal began and the naval base was tasked to support Joint Task Force 160, here providing humanitarian assistance to thousands of Haitian and Cuban migrants ... Since Sea Signal, Guantanamo Bay has retained a migrant operations mission with a steady state migrant popula-

> tion of less than 30. The base has also conducted two contingency migrant operations: Operation Marathon in October 1996 and Present Haven in February 1997. Both of these short-fused events involved the interception of Chinese migrants being smuggled into the United States.

Guantanamo Bay, A Brief History, *at* http://www.nsgtmo.navy.mil/Default.htm (last visited Nov. 10, 2003).

reasons wholly unrelated to the operation of a naval base and coaling station.

If "sovereignty" is "the supreme, absolute, and uncontrollable power by which any independent state is governed," "the power to do everything in a state without accountability," or "freedom from external control: autonomy, independence," [21] it would appear that there is no stronger example of the United States' exercise of "supreme power," or the adverse nature of its occupying power, than this country's purposeful actions contrary to the terms of the lease and over the vigorous objections of a powerless "lessor." *See also New Jersey,* 1997 WL 291594, at * 30 ("The plain and ordinary import of jurisdiction without exception is the authority of a sovereign."). Any honest assessment of the nature of United States' authority and control in Guantanamo today allows only one conclusion: the U.S. exercises all of "the basic attribute[s] of full territorial sovereignty." *See Duro v. Reina,* 495 U.S. 676, 685, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990). Accordingly, we conclude that, under any reading, *Johnson* does not bar this Court's jurisdiction over Gherebi's habeas petition.

### 4. The Guantanamo Lease and Treaty and the Panama Canal Zone Treaty

Our conclusion that habeas jurisdiction lies in this case is bolstered by a comparison of the Guantanamo Lease and continuing Treaty and the Panama Canal Zone Treaty. The two contemporaneously negotiated agreements are unparalleled with respect to the nature of the cession of quintessentially sovereign powers to the United States. Concluded the same year by the Theodore Roosevelt administration,[22] the Guantanamo and Canal Zone agreements are widely viewed as substantially similar. *See, e.g.,* 35 Op. Att'y Gen. 536, 540 (1929) (noting that the Canal Zone agreement "would appear to be no less comprehensive a grant than the lease from Cuba").[23] Both agreements provide for

---

21. *Black's Law Dictionary* defines sovereignty, in pertinent part, as:

> The supreme, absolute, and uncontrollable power by which any independent state is governed; supreme political authority; the supreme will ... *The power to do everything in a state without accountability* ... It is the supreme power by which any citizen is governed and is the person or body of persons in the state to whom there is politically no superior. By sovereignty in its largest sense is meant supreme, absolute, uncontrollable power ... the word by itself comes nearest to being the definition of "sovereignty" is will or volition as applied to political affairs.

BLACK'S LAW DICTIONARY 1396 (emphasis added).

> Similarly, *Webster's Third International* defines sovereignty, in relevant part, as:
> (2)(a)(1): supreme power, esp. over a body politic: dominion, sway
> (a) *freedom from external control: autonomy, independence* ...
> (c)controlling influence

WEBSTER'S THIRD INTERNATIONAL DICTIONARY 2179 (emphasis added).

22. The Guantanamo Lease was signed by the President of Cuba on February 16, 1903 and President Theodore Roosevelt on February 23, 1903. The Canal Zone Treaty was concluded on November 18, 1903, and was subsequently signed by President Roosevelt and ratified by the Senate in February 1904 before being proclaimed on February 25, 1904.

23. Like the 1903 Lease agreements and continuing Treaty governing the terms of U.S. control over Guantanamo, *supra* note 9, Article II of the Convention for the Construction of a Ship Canal (Hay–Bunau–Varilla Treaty) cedes to the U.S. without temporal limitation all power and authority over the Zone. In the case of the Canal Zone, the purpose was "for the construction, maintenance, operation, sanitation and protection of said Canal." Convention for the Construction of a Ship Canal to Connect the Waters of the Atlantic and Pacific Oceans, Nov. 18, 1903, U.S.-Panama, art. II, 33 Stat. 2234, T.S. 431. Article XIV provides for, *inter alia,* the annual payment during the life of the Convention of two hundred and fifty thousand dollars. *Id.,* art.

the ceding of all dominion and control over the territory without temporal limitation, and each limits U.S. use to a particular purpose. Both afford the U.S. the right of eminent domain and the right to purchase real property. Both provide for yearly payments to the ceding nation as specified in the agreements. Only a voluntary act on the part of the United States could, given the terms of the two agreements, result in the restoration of the territory to the ceding country.[24]

Under the terms of the Panama Convention, in the eyes of our government of the time, "the sovereignty of the Canal Zone [wa]s not an open or doubtful question." 26 Op. Att'y Gen. 376, 376 (Sept. 7, 1907). It passed to the United States. As the Attorney General opined:

> Article 3 of the treaty transfers to the United States, not the sovereignty by

that term, but "all the rights, power, and authority" within the Zone that it would have if it were sovereign, "to the entire exclusion of the exercise by the Republic of Panama of any such sovereign rights, power or authority . . ." *The omission to use words expressly passing sovereignty was dictated by reasons of public policy, I assume; but whatever the reason the treaty gives the substance of sovereignty,* and instead of containing a mere declaration transferring the sovereignty, descends to the particulars "all the rights, power, and authority" that belong to sovereignty, and negatives any such "sovereign rights, power, or authority" in the former sovereign.

*Id.* at 377–78 (Sept. 7, 1907) (emphasis added). Similarly, the Guantanamo Lease and continuing Treaty transferred all of the power and authority that together con-

---

XIV. *Cf.* 1903 Supplemental Agreement, *supra* note 9, art. I (providing for the lease payment to Cuba).

Similar to Article III of the 1903 Guantanamo Lease, Article III of the Canal Zone Convention further provides:

> The Republic of Panama grants to the United States all the rights, power, and authority within the zone mentioned and described in Article II of this agreement and within the limits of all auxiliary lands and waters mentioned and described in said Article II which the United States would possess and exercise if it were the sovereign of the territory within which said lands and waters are located to the entire exclusion of the exercise by the Republic of Panama of any such rights, power, or authority.

*Id.,* art. III. Moreover, like Article III of the 1903 Guantanamo Lease, *supra* note 9, Article VII goes on to provide the U.S. with "the right to acquire by purchase or by the exercise of the right of eminent domain, any lands, buildings, water rights or other properties necessary and convenient for the construction, maintenance, operation and protection of the Canal and of any works of sanitation[.]" *Id.,* art. VII.

Under a subsequent treaty executed in 1939 by the same President that signed the 1934 continuing Treaty with Cuba, President

Franklin Delano Roosevelt, the U.S. agreed to additional terms that, *inter alia,* limited business enterprises in the Canal Zone to those directly connected with the canal (and a limited number of truck farmers who had established their farms prior to the treaty). General Treaty of Friendship and Cooperation Between the United States of America and Panama, March 2, 1939, U.S.-Panama, 53 Stat. 1807, T.S. No. 945. *Cf.* 1903 Supplemental Agreement, *supra* note 9, art. III (limiting commercial and industrial enterprises on the Guantanamo Base). At the same time, Article XI of the 1939 Treaty preserved the respective rights and obligations of the parties under the original 1903 agreement including, in the case of the U.S., all the rights that ordinarily pertain to sovereignty. *Cf.* Treaty Defining Relations with Cuba, *supra* note 9, art. III (continuing the 1903 lease agreements governing the Guantanamo Base).

24. The U.S. did, in fact, return the Canal Zone to Panama in December 1999, after years of protests by Panamanians over the unfairness of the 1903 Treaty and its cession of Panamanian territory to the United States. *See* Panama Canal Treaty, Sept. 7, 1977, U.S.—Panama, 33 U.S.T. 47 (establishing the basis for the 1999 re-transfer).

stitute "sovereignty," and therefore transferred sovereignty itself. *See* 25 Op. Att'y Gen 441, 444 (1905) (stating that the "Canal Zone is now within the *sovereign* jurisdiction of the United States") (emphasis added); 26 Op. Att'y Gen. 113, 116 (Jan. 30, 1907) ("Unquestionably [Articles II and II] of the treaty imposed upon the United States the obligations as well as the powers of a *sovereign* within the territory described[.]") (emphasis added); 27 Op. Att'y Gen. 19, 21 (July 24, 1908) (referring to the U.S. as "succeed[ing] to the *sovereignty* of the territory" in the Canal Zone) (emphasis added); 41 Op. Att'y Gen. 44, 49–50 (1916) ("[T]he treaty itself ... is the patent ... by which the United States acquired its *sovereignty* and property rights in the Canal Zone") (emphasis added).[25]

Pursuant to this 1903 Convention, the United States created a complete system of courts for the Canal Zone, *see Egle v. Egle*, 715 F.2d 999, 1011 n. 15 (5th Cir. 1983), including a U.S. District Court for the District of the Canal Zone, a legislative court which exercised both federal and local jurisdiction over citizens and foreign nationals alike, *see* Fed. R.Crim. Proc. 54

(Advisory Note to Subdivision (a)(1), ¶ 9 (citing 48 U.S.C. former §§ 1344, 1345)), and issued final decisions reviewable by the Fifth Circuit Court of Appeals. *See* 28 U.S.C.A. § 1294. Both the Canal Zone district court and the Fifth Circuit had jurisdiction to hear the habeas petitions of detainees in the Zone. *See Voloshin v. Ridenour*, 299 F. 134 (5th Cir.1924) (reviewing three habeas petitions against a U.S. Marshal for the Canal Zone). This jurisdictional regime continued in existence until October 1979, when, "by the Panama Canal Treaty, the United States *relinquished sovereignty* over the Canal Zone." *Egle*, 715 F.2d at 1010 (emphasis added). *See supra* note 24.

Information about the practical implementation of the jurisdictional regime that exists in Guantanamo is comparatively sparse. *But see supra* note 13. As we have explained in Section II(A)(1), however, pursuant to Article IV of the 1903 Supplemental Agreement, the United States exercises exclusive jurisdiction over citizens and aliens alike who commit crimes on the Base. Such persons are subject to trial for their offenses in United States courts.[26] Under the Agreement

**25.** The government places much reliance on comments volunteered in the Court's opinion in *Vermilya–Brown v. Connell*, 335 U.S. 377, 69 S.Ct. 140, 93 L.Ed. 76 (1948), a case in which the Court held that the Fair Labor Standards Act applies to work performed on territory in Bermuda leased for use as a military base for a finite term of 99 years. *See* Agreement and Exchanges of Notes Between the United States of America and Great Britain Respecting Leased Naval and Air Bases, Mar. 27, 1941, U.S.—Great Britain, 55 Stat. 1560, E.A.S. No. 235. In *Vermilya–Brown*, after accepting, for purposes of the opinion, the Secretary of State's view that the U.S. did not obtain sovereignty over the territory in Bermuda, the Court likened the Bermuda lease to the agreements entered into with Cuba and Panama. The Court in *Vermilya–Brown* had no occasion to rule on the legal status of either the Cuban or Panamanian agreements, and its comments regarding their similarity to the Bermuda lease were not ma-

terial to its discussion. The Court was construing the term "territory or possession of the United States" as used in the Act, and afforded it a broad sweep covering territory over which the U.S. exercised sovereign jurisdiction as well as territory over which it did not. Its holding was that the FLSA applied in Bermuda, as it did in Guantanamo and the Canal Zone. Viewed in this light, we do not believe that the Court would consider its observations regarding the similarity of the various agreements to constitute a determination of a fundamental issue of law dispositive of important constitutional rights. Nor do we believe that it would expect the lower courts to treat them as such.

**26.** Crimes on the base involving military personnel are typically handled by a U.S. Navy–Marine Corps Court. *See, e.g., U.S. v. Elmore*, 56 MJ 533 (2001) (Court of Criminal Appeals); *U.S. v. Bobroff*, 23 MJ 872 (1987) (Court of Military Review). Base command-

and continuing Treaty, Cuba is required to turn over to the U.S. authorities any persons, including Cubans, who commit an offense at Guantanamo. *See supra* note 9.

That, in the case of the Canal Zone, the U.S. established a court physically located in the territory whereas in the case of Guantanamo it used the services of U.S. courts located on the mainland is of no legal significance. What is critical is that in both instances, the United States exercised criminal jurisdiction over the territory and the persons there present, and that U.S. criminal statutes applied to aliens and U.S. citizens alike. In such circumstances, it is difficult to understand why persons who are subject to criminal prosecution in the United States for acts committed at Guantanamo should not have the right to seek a writ of habeas corpus for an alleged wrong committed against them at that location—including the act of unlawful detention. Indeed, Article IV of the Supplemental Agreement would appear to be dispositive of the jurisdictional question before us.

In sum, the similarity between the Guantanamo and Canal Zone agreements—two sets of documents unique in the nature of their cession of exclusive dominion and control to the United States—provides additional support for our conclusion that jurisdiction lies over Gherebi's claim. The fact the Canal Zone district court and the Fifth Circuit entertained individual claims both constitutional and non-constitutional until Panama re-assumed sovereign control, and that U.S. courts have exercised criminal, if not civil, jurisdiction over actions occurring at

Guantanamo, simply provides one further compelling reason why we are unwilling to close the doors of the United States courts to Gherebi's habeas claim.

5. **Limited Nature of the Question Presented**

We wish to emphasize that the case before this Court does not require us to consider a habeas petition challenging the decisions of a military tribunal—a case that might raise different issues. Unlike the petitioners in *Johnson*, and even in *Yamashita* and *Quirin*, Gherebi has not been subjected to a military trial. Nor has the government employed the other time-tested alternatives for dealing with the circumstances of war: it has neither treated Gherebi as a prisoner of war (and has in fact declared that he is not entitled to the rights of the Geneva Conventions, *see supra* note 7), nor has it sought to prosecute him under special procedures designed to safeguard national security. *See U.S. v. Bin Laden*, 2001 WL 66393 (S.D.N.Y. Jan.25, 2001) (limiting access to confidential information). Instead, the government is following an unprecedented alternative[27]: under the government's theory, it is free to imprison Gherebi indefinitely along with hundreds of other citizens of foreign countries, friendly nations among them, and to do with Gherebi and these detainees as it will, when it pleases, without any compliance with any rule of law of any kind, without permitting him to consult counsel, and without acknowledging any judicial forum in which its actions may be challenged. Indeed, at oral argument, the government advised us that its position would be the same even if the

---

ers are required to hold for civil authorities any person not subject to the Uniform Code of Military Justice who is suspected of criminal activity. *See Rogers*, 388 F.Supp. at 301 (discussing Navy Regulations (1973, Section 0713)).

**27.** *See, e.g.,* American College of Trial Lawyers, REPORT ON MILITARY COMMISSIONS FOR THE TRIAL OF TERRORISTS 8 (Mar.2003)("[T]he placement of the detainees at Guantanamo, w[as] carefully designed to evade judicial scrutiny and to test the limits of the President's constitutional authority.").

claims were that it was engaging in acts of torture or that it was summarily executing the detainees. To our knowledge, prior to the current detention of prisoners at Guantanamo, the U.S. government has never before asserted such a grave and startling proposition. Accordingly, we view Guantanamo as unique not only because the United States' territorial relationship with the Base is without parallel today, but also because it is the first time that the government has announced such an extraordinary set of principles—a position so extreme that it raises the gravest concerns under both American and international law.

### 6. Conclusion

In sum, we hold that neither *Johnson v. Eisentrager* nor any other legal precedent precludes our assertion of jurisdiction over Gherebi's habeas petition. Although we agree with the government that the legal status of Guantanamo constitutes the dispositive factor in our jurisdictional inquiry, we do not find that *Johnson* requires sovereignty rather than simply the existence of territorial jurisdiction, which unquestionably exists here. Alternatively, we conclude that both the Lease and continu-

ing Treaty as well as the practical reality of the U.S.'s exercise of unrestricted dominion and control over the Base compel the conclusion that, for the purposes of habeas jurisdiction, Guantanamo is sovereign U.S. territory.

### B. The Jurisdiction of the U.S. District Court for the Central District of California

■ Having determined that *Johnson* and other legal precedent do not act as a bar to the jurisdiction of Article III courts, we turn now to the question of whether the District Court for the Central District of California has personal jurisdiction over a proper respondent in this case. The habeas corpus statute, 28 U.S.C. § 2241(a), permits the writ to be granted by district courts "within their respective jurisdictions." The writ

> ... does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody.... *Read literally, the language of § 2241(a) requires nothing more than that the court issuing the writ have jurisdiction over the custodian.*[28]

---

**28.** Gherebi names Secretary Rumsfeld, as well as President Bush and other military and civilian officials, as respondents. The government asserts that the proper respondents in the instant case are at the Pentagon, and therefore that the only court that has territorial jurisdiction over the appropriate custodians is the U.S. District Court for the Eastern District of Virginia. The government has not, however, moved to dismiss the petition against respondents other than Secretary Rumsfeld. Nor do they contend that the appropriate respondent is the "immediate custodian" rather than the "ultimate custodian." *See, e.g., Sanders v. Bennett,* 148 F.2d 19, 20 (D.C.Cir.1945); *Monk v. Sec'y of the Navy,* 793 F.2d 364 (D.C.Cir.1986).

We agree that the proper custodian is Secretary Rumsfeld. *See, e.g., Armentero v. INS,* 340 F.3d 1058, 1063 (9th Cir.2003) (holding that the "most appropriate respondent to peti-

tions brought by immigration detainees is the individual in charge of the national government agency under whose auspices the alien is detained"). While it was the President who directed the Department of Defense to conduct the military operations in Afghanistan, it is the Defense Department rather than the White House that will decide (at least in form) whether Gherebi is released from Guantanamo. It is also the Defense Department that maintains the Base and has custody over all prisoners. Because the appropriate individual respondent is the head of the national government agency under whose auspices the alien is detained, Donald Rumsfeld is the appropriate respondent in this proceeding. We also note that this Court's power to direct the President to perform an official act raises constitutional questions easily avoided by naming the Secretary alone. *See Franklin v. Massachusetts,* 505 U.S. 788, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). Accordingly, we

*Braden v. 30th Judicial Circuit Court of Kentucky,* 410 U.S. 484, 495, 93 S.Ct. 1123, 35 L.Ed.2d 443 (emphasis added). A court has personal jurisdiction in a habeas case "so long as the custodian can be reached by service of process." *Id.*

■ The government argues, based on *Schlanger v. Seamans,* 401 U.S. 487, 489, 91 S.Ct. 995, 28 L.Ed.2d 251 (1971), that the custodian must be *physically present* so that he may be served in the Central District. In *Schlanger,* the Court concluded that "the *absence* of the [proper] custodian is fatal to the jurisdiction of the Arizona District Court." *Id.* at 491, 91 S.Ct. 995(emphasis added). However, one year later, in *Strait v. Laird,* 406 U.S. 341, 345, 92 S.Ct. 1693, 32 L.Ed.2d 141 (1972), the Court distinguished *Schlanger, see id.* at 344–45, 92 S.Ct. 1693, and held that habeas jurisdiction is proper even though the custodian is not *physically* present in the relevant district, as long as the custodian is within reach of the court's process. The Court reasoned:

> That such "presence" may suffice for personal jurisdiction is well settled, *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223; *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, and the concept is also not a novel one as regards to habeas corpus jurisdiction. In *Ex Parte Endo,* 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243, we said that habeas corpus may issue "if a respondent who has custody of the prisoner is within reach of the court's process. . . ." Strait's commanding officer is "present" in California *through his contacts in that State;* he is therefore "within reach" of the federal court in which Strait filed his petition. *See Donigian v. Laird,* 308

F.Supp. 449, 453; *cf. United States ex. rel. Armstrong v. Wheeler,* D.C., 321 F.Supp. 471, 475.

*Id.* at 345 n. 2, 92 S.Ct. 1693 (emphasis added). By invoking *International Shoe,* and speaking in terms of "contacts" and the "reach of the court's process," the Court in *Strait* imported the standard doctrine of personal jurisdiction into the analysis of jurisdiction pursuant to 28 U.S.C. § 2241. *See also id.* at 349, 92 S.Ct. 1693 (Rehnquist, J., dissenting) (noting that the majority opinion in *Strait* held that "the type of contacts that have been found to support state jurisdiction over nonresidents under cases like [*International Shoe* ] would also suffice for habeas jurisdiction").

■ Having established that Secretary Rumsfeld need not be physically present in order for the Central District to exercise jurisdiction, the next question is whether the Secretary has the requisite "minimum contacts" to satisfy the forum state's long-arm statute,[29] which extends jurisdiction to the limits of due process. *See* Cal.Code of Civ. Pro. 410.10. Constitutional due process concerns are satisfied when a nonresident defendant has "certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional conceptions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Where a defendant's activities in the forum are substantial, continuous, and systematic, general jurisdiction is available, and the foreign defendant is subject to suit even on matters unrelated to his or her contacts with the forum. *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). Here, the activi-

conduct our analysis as if the Secretary were the single named respondent in this case.

**29.** For an analysis of personal jurisdiction under California law, see generally *Doe v.*

*Unocal Corp.,* 248 F.3d 915 (9th Cir.2001), *reh'g en banc granted and opinion vacated by Doe v. Unocal Corp.,* 2003 WL 359787 (9th Cir.2003).

ties of Secretary Rumsfeld and the department he heads are substantial, continuous, and systematic throughout the state of California: California has the largest number of military facilities in the nation (sixty-one), including major military installations, Department of Defense laboratories, and testing facilities. *See* California's Technology, Trade, and Commerce Agency, Business & Community Resources, Military Base Revitalization, http://www.commerce.ca.gov/state/ttca (last visited Nov. 10, 2003). Many of these activities are carried out in the Central District of California. Accordingly, we conclude that Secretary Rumsfeld has the requisite "minimum contacts" to satisfy California's long-arm statute, and we hold that the United States District Court for the Central District has jurisdiction over Gherebi's nominal custodian, Secretary Rumsfeld, for purposes of § 2241(a).

## C. Venue

Although we hold that *Johnson* does not bar habeas jurisdiction and further determine that the Central District may exercise personal jurisdiction over the Secretary, the question of venue presents a final, additional issue. The government has suggested that we might transfer the petition to the Eastern District of Virginia.[30] The applicable rule is that "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a); *cf.* 28 U.S.C. § 1406(a) (providing for transfer where venue is wrongly laid).[31] In making the decision to transfer,

> a court must balance the preference accorded the plaintiff's choice of forum with the burden of litigating in an inconvenient forum. The defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum. As part of this inquiry, the court should consider private and public interest factors affecting the convenience of the forum. Private factors include the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling; and the cost of obtaining attendance of willing witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make the trial of a case easy, expeditious and inexpensive." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). Public factors include "the administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home;' the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law and the unfairness of

---

**30.** In fact, it was only in a footnote that the government urged that the case be transferred, and then only for want of *jurisdiction* under 28 U.S.C. § 1631. Because § 1631 relates to subject matter jurisdiction, *see, e.g., Puget Sound Energy, Inc. v. U.S.,* 310 F.3d 613, 621 (9th Cir.2002), and because subject matter jurisdiction over habeas petitions lies in all of the district courts, we reject that argument. The question of transfer pursuant to 28 U.S.C. § 1404(a) presents a distinct issue, however. Neither party has addressed this question, nor has the government filed a

motion to transfer under § 1404(a). Thus, it is only because of the unique circumstances surrounding this appeal that we mention the issue, although we do not resolve it here.

**31.** Under 28 U.S.C. § 1406(a), if a case is filed in the *wrong* district, a district court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *See King v. Russell,* 963 F.2d 1301, 1303–04 (9th Cir.1992).

burdening citizens in an unrelated forum with jury duty." *Piper Aircraft,* 454 U.S. at 241 n. 6, 102 S.Ct. 252 (quoting *Gulf Oil Corp.,* 330 U.S. at 509, 67 S.Ct. 839).

*Decker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834, 843 (9th Cir.1986). Some of the above considerations are clearly not applicable to habeas cases. Moreover, as a general matter, the district court is not required to "determine the best venue," *Bates v. C & S Adjusters, Inc.,* 980 F.2d 865, 867 (2d Cir.1992) (discussing the general venue statute, 28 U.S.C. § 1391), and transfer under § 1404(a) "should not be freely granted." *In re Nine Mile, Ltd.,* 692 F.2d 56, 61 (8th Cir.1982). Section 1404(a) provides for transfer to a more convenient forum, "not to a forum likely to prove equally convenient or inconvenient," *Van Dusen v. Barrack,* 376 U.S. 612, 646, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), and a "transfer should not be granted if the effect is simply to shift the inconvenience to the party resisting the transfer." *Id.* Further, there is a strong "presumption in favor of plaintiff's choice of forums." *Gulf Oil,* 330 U.S. at 508, 67 S.Ct. 839. This presumption must be taken into account when deciding whether the convenience of the *parties—* rather than the convenience of *respondent—*requires a transfer.

In the typical habeas case, problems of venue are simplified by the fact that "the person with the immediate control over the prisoner has the literal power to 'produce' the body and · is generally located in the same place as the petitioner." *Henderson,* 157 F.3d at 122. Here, however, the question is significantly more complicated. The place where the prisoner is being held and in which the immediate custodian is located is not a suitable or even possible venue; instead, a next-friend habeas movant, resident of California, is petitioning on behalf of a prisoner held outside of the physical confines of the United States. Also, in this case, factors such as the convenience of parties and witnesses and the ease of access to sources of proof cannot be weighed with the same ease and transparency afforded by the typical habeas proceeding. Finally, the public interest factors, which may be of critical importance here, are such that it is not possible to evaluate them adequately until after the government has presented its arguments in the district court.

In short, here, the question of the appropriate venue involves different considerations than are present in the ordinary case. While respondent Rumsfeld's presence in the Eastern District of Virginia might appear, at first blush, to warrant transfer to that district, there may be substantial considerations that will weigh in favor of determining that venue is proper in the Central District of California.[32] In

---

**32.** For example, both the habeas movant and his counsel are located in California, *see Gulf Oil,* 330 U.S. at 509, 67 S.Ct. 839 (location of movant a factor to consider); *Padilla v. Rumsfeld,* 233 F.Supp.2d 564, 587 (S.D.N.Y. 2002) (location of counsel a factor to consider), and because the Central District court is already familiar with the case, transfer may lead to delay. *CFTC v. Savage,* 611 F.2d 270, 279 (9th Cir.1979). Further, neither of the two "particularly important" factors bearing on convenience and venue in alien habeas cases appear to weigh in favor of transfer in this case: on the one hand, there is a legiti-

mate concern that transfer of Guantanamo detainees' individual petitions to the Eastern District of Virginia could flood the jurisdiction "beyond the capability of the district court to process in a timely fashion," *see Henderson,* 157 F.3d at 127; *Strait,* 406 U.S. at 345, 92 S.Ct. 1693; conversely, the danger of forum-shopping may not pose a significant risk here because traditional venue doctrine would insure that these next-friend suits are brought in the district of residence of the habeas movant, *see Henderson,* 157 F.3d at 127. *See also Armentero,* 340 F.3d at 1069– 70.

any event, the government has not formally moved to transfer pursuant to 28 U.S.C. § 1404(a) or put forth the appropriate evidence to support its case;[33] the parties have not briefed this issue; and no court has had occasion to consider the relevant factors bearing on venue such as ease of access to sources of proof and the convenience and cost of obtaining witnesses. Finally, the public interest factors in this case may require particularly careful scrutiny once the complete record is before the district court. All of these questions are best resolved, in the first instance, by the district court, and we express no view on the proper outcome here. Accordingly, we remand to the Central District to determine whether venue is proper, should the government renew its motion in that forum.

### D. The desirability of a full exploration of the jurisdictional issues by the Courts of Appeals.

The dissent asserts that we should defer our decision in this case until after the Supreme Court has decided the pending Guantanamo detainee case in which certiorari has been granted. *Al Odah v. United States*, 321 F.3d 1134 (D.C.Cir.2003), *cert. granted*, —— U.S. ——, 124 S.Ct. 534, 157 L.Ed.2d 407, 2003 WL 22070725 (Nov. 10, 2003). We strongly disagree. The Supreme Court has always encouraged the Courts of Appeal to resolve issues properly before them in advance of their determination by the Supreme Court, reasoning that having a variety of considered perspectives will aid the Court's ultimate resolution of the issue in question. *See United States v. Sperry Corp.*, 493 U.S. 52, 66, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989) (noting that

the Court "benefit[s] from the views of the Court[s] of Appeals"); *United States v. Mendoza*, 464 U.S. 154, 160, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984) (noting that the Court benefits when several Courts of Appeal hear an issue prior to Supreme Court review); *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 135, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977) (lauding the "wisdom of allowing difficult issues to mature through full consideration by the courts of appeals" and noting that having a variety of perspectives can "vastly simplif[y] our task"). Circuit courts have also noted the importance of several circuits' examining important legal questions before the Supreme Court makes a final determination. *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir.2001) (emphasizing that opinions from multiple circuits helps develop "important questions of law" and that the Supreme Court benefits from "decisions from several courts of appeals"); *Atchison, T. & S.F. Ry. v. Pena*, 44 F.3d 437, 447 (7th Cir.1994) (Easterbrook, J., concurring) (noting that conflicting decisions "among the circuits ... [lend] the Supreme Court [the] benefit of additional legal views that increase the probability of a correct disposition"). This is especially the case here, given the importance of the issue, the dearth of considered opinions, and the conflict in views and reasoning that, as a result of our opinion, will now be available to the Supreme Court.

### III. CONCLUSION

We hold that the district court erred in concluding, based on *Johnson v. Eisentrager*, that no district court would have jurisdiction over Gherebi's habeas petition.

---

**33.** The party seeking the transfer must clearly specify the essential witnesses to be called and must make a general statement of what their testimony will cover. In determining the convenience of the witnesses, the Court must examine the materiality and importance of the anticipated witnesses' testimony and then determine their accessibility and convenience to the forum. *See* 15 CHARLES A. WRIGHT, ET AL., FED. PRACTICE & PROCEDURE § 3851(West 2003).

We also hold that the Central District may exercise jurisdiction in this case because the Secretary of Defense is subject to service of process under the California long-arm statute. Finally, we remand to the district court for consideration of the question whether transfer to a different district than the Central District of California would be appropriate.

**REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

GRABER, Circuit Judge, dissenting:

With regret, I must respectfully dissent.

The second sentence of its opinion contains the key to the majority's errors here: "The issues we are required to confront are new, important, and difficult." Maj. op. at 1280. Although the issues that we confront are important and difficult, they are not new. Because the issues are not new, we are bound by existing Supreme Court precedent, which the majority misreads. Because the issues are important and difficult, the Supreme Court has decided to revisit them, and we should await the Supreme Court's imminent decision.

1. *Johnson v. Eisentrager*

In *Johnson v. Eisentrager*, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), the Supreme Court held that an enemy alien who was detained by the United States military overseas could not bring a petition for habeas corpus in the courts of the United States. Our courts lack jurisdiction in that circumstance, and the sole remedy for the enemy alien lies with the political branches of government.[1] *Id.* at 779–81, 70 S.Ct. 936.

A straightforward reading of *Johnson* makes it clear that "sovereignty" is the touchstone, under *current* law, for the exercise of federal courts' jurisdiction. As the Supreme Court explained, the petitioners in *Johnson* could not bring a habeas petition because they committed crimes, were captured, were tried, and were being detained outside "any territory over which the United States is sovereign." *Id.* at 777, 70 S.Ct. 936.

The majority invents the novel proposition that, because the Supreme Court used the phrase "territorial jurisdiction" more often than it used the term "sovereignty," the former concept governs and the latter may be disregarded. Maj. op. at 1287–88. Counting phrases is not, in my view, a valid method of analyzing the Court's meaning.

More telling is the way in which the Court distinguished cases in which enemy aliens were allowed to bring habeas petitions in federal courts, cases like *Yamashita v. Styer (In re Yamashita)*, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499 (1946). In *Johnson* the Court held that *Yamashita* was different because, in *Yamashita*, the United States had "sovereignty" over the place where the petitioner was held and, therefore, the federal courts had jurisdiction "[b]y reason of our sovereignty." *Johnson*, 339 U.S. at 780, 70 S.Ct. 936. "Sovereignty" was the only distinction on which *Johnson* relied. There may be, as the majority argues, other possible distinctions, but they were of no moment to the *Johnson* Court, whose opinion we must construe.

In short, the holding in *Johnson* precludes federal courts from exercising jurisdiction over an enemy alien who is de-

---

1. Two of our sister circuits have reached the identical conclusion. *See Al Odah v. United States*, 321 F.3d 1134, 1143 (D.C.Cir.2003), *cert. granted*, —— U.S. ——, 124 S.Ct. 534, 157 L.Ed.2d 407 (2003) (*"Rasul "*), *and* —— U.S. ——, 124 S.Ct. 534, 157 L.Ed.2d 407 (2003) (*"Al Odah "*) (consolidated); *Cuban Am. Bar Ass'n v. Christopher*, 43 F.3d 1412, 1425 (11th Cir.1995).

tained—and who has always been—outside the sovereign territory of the United States. Only the Supreme Court may modify the "sovereignty" rule established by *Johnson.* *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). The majority cites no authority in which the Supreme Court has declared that *Johnson* is no longer good law.

The Supreme Court has granted certiorari in a consolidated appeal that presents an opportunity for the Court to revisit *Johnson's* "sovereignty" rule. *See Al Odah v. United States,* 321 F.3d 1134 (D.C.Cir.2003), *supra* note 1. Until the Supreme Court informs us otherwise, however, the key inquiry remains whether the Guantanamo Bay Naval Base ("Guantanamo") is sovereign territory of the United States.

### 2. The Status of Guantanamo Bay Naval Base

#### a. The Guantanamo Lease

##### (i) The Lease Recognizes the "Continuance of Ultimate Sovereignty" by Cuba Over Guantanamo.

The majority concludes "that, at least for habeas purposes, Guantanamo is a part of the sovereign territory of the United States." Maj. op. at 1290. There are two things wrong with that sentence.

First, it is unclear how a place can be, as the majority implies Guantanamo is, a part of "the sovereign territory of the United States" for habeas purposes but not for other purposes. The "sovereignty" that *Johnson* requires appears to be the ordinary kind. *Cf.* Black's Law Dictionary 1402 (7th ed.1999) (defining "sovereignty" as: "1. Supreme dominion, authority, or rule. 2. The supreme political authority of an independent state. 3. The state itself.").

Second, and more fundamentally, Guantanamo is the sovereign territory of Cuba. The relevant treaty explains that "the United States recognizes *the continuance of the ultimate sovereignty of the Republic of Cuba* over the above described areas of land and water." Agreement Between the United States and Cuba for the Lease of Lands for Coaling and Naval Stations, Feb. 16–23, 1903, U.S.-Cuba, art. III, T.S. No. 418 ("Guantanamo Lease") (emphasis added).[2]

The majority's interpretation of the Guantanamo Lease is problematic because the majority takes the phrase "ultimate sovereignty" out of context. I already have cited the definition of "sovereignty." The 1913 version of Webster's Revised Unabridged Dictionary offers these definitions for "ultimate":

1. Farthest; most remote in space or time; extreme; last; final.

---

**2.** In addition to the Guantanamo Lease, other agreements between the United States and Cuba are relevant. The two governments agreed on July 2, 1903, to the so-called "Parallel Treaty," which "conclude[d] the conditions of the lease" signed in February 1903. Lease of Certain Areas for Naval or Coaling Stations, July 2, 1903, T.S. No. 426 ("Parallel Treaty"), pmbl. The Parallel Treaty also set additional terms (such as the amount of annual rent) affecting the Guantanamo Lease. Ad-

ditionally, the 1934 U.S.-Cuba Treaty maintained that the "supplementary agreement in regard to naval or coaling stations signed between the two Governments on July 2, 1903, also shall continue in effect in the same form and on the same conditions with respect to the naval station at Guantanamo." Treaty Between the United States of America and Cuba Defining Their Relations, May 29, 1934, U.S.-Cuba, art. III, 48 Stat. 1682, 1683.

2. Last in a train of progression or consequences; tended toward by all that precedes; arrived at, as the last result; final.

3. Incapable of further analysis; incapable of further division or separation; constituent; elemental; as, an ultimate constituent of matter.

Webster's Revised Unabridged Dictionary 1560 (1913), http://humanities.uchicago.edu/forms_unrest/webster.form.html.

The majority reads the Lease's use of "ultimate" in the temporal sense ("most remote in … time"). In context, however, I believe that the Lease is using "ultimate" in the sense of "extreme," "incapable of further division or separation," or "elemental." That is, key to understanding the phrase "ultimate sovereignty" is to recognize the significance of the contextual term "continuance."[3]

The 1913 dictionary offers these definitions for "continuance":

1. A holding on, or remaining in a particular state; permanence, as of condition, habits, abode, etc.; perseverance; constancy; duration; stay.

2. Uninterrupted succession; continuation; constant renewell [sic]; perpetuation; propagation.

3. A holding together; continuity. [Obs.]

4. (Law)(a) The adjournment of the proceedings in a cause from one day, or from one stated term of a court, to another. (b) The entry of such adjournment and the grounds thereof on the record.

*Id.* at 313. The only definitions that make sense in the present context are the first and second ones—the third being obsolete, and the fourth being obviously irrelevant. Thus, the Lease's use of the word "continuance" denotes the *ongoing* nature of Cuba's "ultimate sovereignty" over Guantanamo.

The majority's attempt to explain away the contextual use of the words "continuance" and "ultimate" is unpersuasive. The majority reads the Lease to vest in Cuba only a "contingent sovereign interest—a reversionary right that springs into being upon a lawful termination of the U.S. reign. It is this reversionary interest that is 'continued' even as substantive (or qualitative) sovereignty is ceded to the United States." Maj. op. at 1293.

The Lease might have *created* such a reversionary right (although I read it differently). But the Lease logically could not have *continued* such a right, because no such "reversionary" right existed *before* the Lease was signed (when Cuba indisputably was the sole sovereign over Guantanamo).

By contrast, if "ultimate" refers not to the temporal activation of a reversionary interest, but to ongoing *elemental, indivisible* sovereignty, the whole phrase—"the continuance of the ultimate sovereignty of the Republic of Cuba"—in the Guantana-

---

**3.** Under Article 31.1 of the Vienna Convention, "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty *in their context* and in the light of its object and purpose." Vienna Convention on the Law of Treaties, May 23, 1969, art. 31.1, 1155 U.N.T.S. 331 (Jan. 27, 1980) (emphasis added). Although the United States is not a signatory to the Vienna Convention, it is the policy of the United States to apply Articles 31 and 32 as customary international law. *Gon-* *zalez v. Gutierrez,* 311 F.3d 942, 949 n. 15 (9th Cir.2002).

To the extent that the Lease is better seen as a contract, similar rules require us to give each word meaning. *See Cree v. Waterbury,* 78 F.3d 1400, 1405 (9th Cir.1996) (explaining the rule of contract construction that "a court must give effect to every word or term employed by the parties and reject none as meaningless or surplusage in arriving at the intention of the contracting parties" (internal quotation marks omitted)).

mo Lease makes sense. The Lease is discussing the continuance of the elemental, indivisible sovereignty of Cuba with respect to Guantanamo.[4]

The drafters of the Lease wanted to make clear that, although the United States was granted powers that often run *with* sovereignty (e.g., "complete jurisdiction and control"), in fact Cuba was retaining *all* sovereignty over Guantanamo for itself. That is to say, Cuba retained ultimate, or elemental, or indivisible sovereignty, despite the fact that the United States would be allowed to act, de facto, a lot like a sovereign would act.

The majority's concerns about what the word "ultimate" could add to the concept of "sovereignty," maj. op. at 1291–92, are thus misplaced. The Lease goes to great pains to explain that *all* sovereignty over Guantanamo is "unbundled" from the rights of jurisdiction and control. Cuba keeps the former continually, while the United States enjoys the latter. The word "ultimate" serves the purpose of preventing the United States from asserting that it has any legal sovereignty deriving from the jurisdiction and control that it enjoys. In the absence of the word "ultimate," one could conclude that Cuba had handed over not only the rights to jurisdiction and control, but also the underlying sovereignty that forms the basis for the authority to enjoy (or, as here, to transfer the right to enjoy) those rights.

The contemporaneously signed Spanish version of the Lease supports a substantive, rather than temporal, understanding of the term "ultimate" even more strongly than the English version. *See United State v. Percheman*, 32 U.S. (7 Pet.) 51, 88, 8 L.Ed. 604 (1833) ("If the English and the Spanish parts can, without violence, be made to agree, that construction which establishes this conformity ought to prevail."). The Spanish version of the disputed text reads: "Si bien los Estados Unidos reconocen por su parte la continuación de la *soberania definitiva* de la República de Cuba." Convenio de 16/23 de Febrero de 1903, Entre la República de Cuba y los Estados Unidos de América para arrendar á los Estados Unidos (bajos las condiciones que habran de convenires por los dos Gobiernos) tierras en Cuban para estaciones carboneras y navales, *Tratados, Convenios y Convenciones* (Habana 1936) (emphasis added). There is no dispute that "soberania" refers to "sovereignty" or that "continuación" equates to the English cognate "continuation." The word "definitiva" is the feminine form of the adjective "definitivo," which meant to a reader at the time "[d]ícese de lo que decide, resuelve o concluye": a term used to describe that which decides, resolves or concludes [a matter]. Diccionario de la Lengua Castellana por la Real Academia Española 329 (Decimocuarta ed.1914). A contemporaneous Spanish–to–English dictionary translated "definitivo" as (not surprisingly) "definitive" or

---

**4.** Sovereignty is not always an all-or-nothing concept. "Partial sovereignty" and the concurrent existence of "joint sovereigns" are well-established concepts in American law. For example, this concept of less-than-complete sovereignty is at the heart of our federal system: the States are "sovereign" but subject to requirements imposed by the Federal Constitution. Thus, the Supreme Court has explained the purpose of the Eleventh Amendment as being "rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); *see also Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 765, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002) (explaining that the central purpose of the sovereign immunity doctrine is to "accord the States the respect owed them as joint sovereigns" (internal quotation marks omitted)). Thus, in theory, Cuba could have ceded *some*, but not *all*, of its sovereignty over Guantanamo to the United States.

"determinate." A New Pronouncing Dictionary of the Spanish and English Languages 209 (1908). At the time, "definitive" was understood primarily to mean "[d]eterminate; positive; final; conclusive; unconditional; express." Webster's at 382. Similarly, "determinate" was defined as "[h]aving defined limits; not uncertain or arbitrary; fixed; established; definite[;][c]onclusive; decisive; positive." *Id.* at 401. Although a temporal sense could be squeezed out of those definitions, their most natural meaning is that the issue of sovereignty was decided, resolved, or concluded in favor of Cuba.

### (ii) *Other Terms of the Lease Suggest That Cuba Retains Sovereignty Over Guantanamo.*

Other provisions of the Lease demonstrate that Cuba currently enjoys sovereignty over Guantanamo. Article III of the Lease states that Cuba consents to the United States' exercise of jurisdiction and control over Guantanamo "during the period of the occupation" by the United States. The 1913 Webster's dictionary defines "occupation" (in relevant part) as "1. The act or process of occupying or taking possession; actual possession and control; the state of being occupied; a holding or keeping; tenure; use; as, the occupation of lands by a tenant." Webster's at 994. Thus, the United States, as an "occupier," enjoys the status of a tenant rather than a landlord. Indeed, it would be odd for a sovereign to be described as "occupying" its own lands; instead, the term usually means the exercise of control by one nation over the sovereign territory of another.

Additionally, if the United States were a true sovereign, it could permissibly do many things at Guantanamo that it is not entitled to do. For instance, the United States may not permissibly change the use of the land (say, by raising commercial crops);[5] if the United States were sovereign, it could raise commercial crops. If the property is abandoned, the lease ends automatically;[6] if the United States were sovereign, it could allow the land to lie idle without jeopardizing its sovereignty and its concomitant right to use the property later. Cuban trade vessels must be allowed free passage;[7] if the United States were sovereign, it could choose to refuse passage to another nation's vessels for economic, political, or other reasons. The United States pays rent; if it were sovereign, it would have the legal right to use the land without paying another sovereign state annually for the privilege. The United States never has enjoyed these rights because Cuba, as sovereign, never relinquished them.

The majority asserts that the United States has repeatedly breached the terms of the Lease by using Guantanamo other than as a naval base and coaling station. Maj. op. at 1294.[8] The majority then rea-

---

**5.** Guantanamo Lease, art. II ("The grant … shall include the right … to do any and all things necessary to fit the premises for use as coaling or naval stations only, *and for no other purpose.*" (emphasis added)).

**6.** Parallel Treaty, art. I ("The United States of America agrees and covenants to pay to the Republic of Cuba the annual sum of two thousand dollars, in cold coin of the United States, as long as the former shall occupy and use said areas of land by virtue of said agreement.").

**7.** Guantanamo Lease, art. II.

**8.** Although the United States may have violated the Lease in a number of ways, holding prisoners at Guantanamo does not appear to be one of them. Under the Lease, the United States is entitled to maintain a Navy base at Guantanamo. Navy bases commonly contain brigs to hold prisoners. *See, e.g.,* The Brig: A Two Hundred Year Tradition, *at* http://www.brigpuget.navy.mil/history.htm (last visited Dec. 11, 2003). Using the Guantanamo brig to hold prisoners thus seems at first blush not to violate the Lease's provisions.

sons that sovereignty is demonstrated by the United States' repeated violations of the Lease. Maj. op. at 1294. That conclusion does not follow.

The fact that Cuba lacks the political or military might necessary to hold the United States responsible for breaching the Lease does not mean that the United States has not breached the Lease or that the Lease has ceased to exist.[9] The ability to violate terms of an agreement with impunity does not render a party legally free to ignore the agreement. It means only that the party in breach is spared the practical consequences of its improper acts. If a celebrity tenant breaches his lease by keeping unauthorized pets, and the landlord feels that she can do nothing about it, the tenant does not thereby become the owner of the house. Indeed, the landlord may not even have waived the right to enforce the no-pet term of the lease later. Rather, the tenant is in breach of the lease but escapes the attendant consequences.

Similarly, even if the United States has violated the Lease, it simply is big enough and strong enough that Cuba has been unable to enforce its legal entitlements. This difference in power does not erase the United States' obligations under the Lease, nor does it mean that Guantanamo is a part of the sovereign territory of the United States. The Lease is actually a lease, albeit a highly unusual one with a very pushy tenant.

As is the case with most leases, the tenant has a right of quiet enjoyment during the lease term. The owner—even though "ultimate" ownership "continues" during the term of the lease—gives up jurisdiction and control over the property with whatever limits are agreed by the parties to the lease. That is just what happened here. Even a life tenancy or an option to buy does not convey fee simple ownership to the tenant.

### b. *The Hay–Bunau–Varilla Treaty*

The majority seeks to bolster its conclusion that Guantanamo is part of the sovereign territory of the United States by referring to the 1904 Hay–Bunau–Varilla Treaty ("Panama Canal Treaty"), which authorized construction of the Panama Canal. Maj. op. at 1296–97. An examination of the Panama Canal Treaty actually weakens the majority's case, however.

The Attorney General's Opinion explained that, in the view of the executive branch:

> Article 3 of the treaty transfers to the United States, not the sovereignty by that term, but "all the rights, power and authority" within the Zone that it would have if it were sovereign. . . .
>
> The omission to use words expressly passing sovereignty was dictated by reasons of public policy, I assume; but whatever the reason the treaty gives the substance of sovereignty, and instead of containing a mere declaration transferring the sovereignty, descends to the particulars "all the rights, power, and authority" that belong to sovereignty, and negatives any such "sovereign rights, power, or authority" in the former sovereign.

26 Op. Att'y Gen. 376, 377 (1907). Article III of the Panama Canal Treaty, on which the Attorney General's Opinion relied, reads in its entirety:

> The Republic of Panama grants to the United States *all the rights, power and authority* within the zone mentioned and described in Article II of this agreement

---

9. The Government of Cuba apparently adheres to my view on this point. *See* Maj. op. at 1294 n. 19.

and within the limits of all auxiliary lands and waters mentioned and described in said Article II *which the United States would possess and exercise if it were the sovereign of the territory* within which said lands and waters are located to the entire exclusion of the exercise by the Republic of Panama of any such sovereign rights, power or authority.

Convention for the Construction of a Ship Canal to Connect the Waters of the Atlantic and Pacific Oceans, Nov. 18, 1903, U.S.-Panama, art. III, 33 Stat. 2234 (emphasis added).

The text of Article III of the Panama Canal Treaty differs from the provisions of the Guantanamo Lease. The Guantanamo Lease never says that the United States is granted "all" of the "rights, power and authority" that it would enjoy "if it were the sovereign." To the contrary, the Guantanamo Lease mentions the concept of sovereignty in connection with *Cuba*, not in connection with the United States. The Guantanamo Lease provides that "the United States recognizes the continuance of the ultimate *sovereignty of the Republic of Cuba* over the above described areas of land and water." Guantanamo Lease, art. III (emphasis added). There is no similar recognition in the Panama Canal Treaty.

The Panama Canal Treaty and the Guantanamo Lease share many similarities, as the majority points out. But the only question here is whether the United States was granted sovereignty, and the texts of the documents differ dramatically on this point. The Panama Canal Treaty granted "all the rights, power and authority" of a "sovereign" to the United States, with no express reservation of sovereignty to Panama. The Guantanamo Lease is just the opposite; it grants to the United States the "exercise" of "complete jurisdiction and control over and within" a designated area, while reserving "the continu-

ance of the ultimate sovereignty" to Cuba. This distinction in the texts of the two documents must be deemed intentional and must be given effect. The Panama Canal Treaty passed sovereignty to the United States, while the Guantanamo Lease did not.

A comparison of the provisions of the two documents with respect to eminent domain, likewise, underscores the differing treatment of sovereignty. In the Guantanamo Lease, Cuba gives the United States the power of eminent domain; that is, this is a lease with an option to buy. Guantanamo Lease, art. III. If the United States were sovereign, this provision would be redundant because, by definition, a sovereign could exercise the power of eminent domain.

An examination of the Panama Canal Treaty illustrates this truism. In the Panama Canal Treaty, Panama gave the United States a similar power of eminent domain, or a lease with an option to buy, *only* with respect to *areas that were not given to the United States as its sovereign territory*— the cities and harbors of Panama and Colon. Panama Canal Treaty, arts. II and VII. In the areas as to which Panama ceded sovereignty, such a clause was unnecessary because the power of eminent domain is an attribute of sovereignty. But, in both the Guantanamo Lease and the Panama Canal Treaty, in areas as to which Cuba and Panama (respectively) retained sovereignty the option to buy had to be granted specifically as a contractual term.

### 3. *Separation of Powers*

One additional point bears mention. The executive branch has taken the position that "the United States has no claim of sovereignty over the leased areas" of Guantanamo. Brief for Appellees George W. Bush et al., filed June 18, 2003, at 17.

Rather, "Guantanamo Bay Naval Base is located within the sovereign territory of the Republic of Cuba." *Id.*

The Supreme Court has recently reminded us that the Constitution allocates the foreign relations power to the federal executive in recognition of the "concern for uniformity in this country's dealings with foreign nations." *Am. Ins. Ass'n v. Garamendi,* —— U.S. ——, ——, 123 S.Ct. 2374, 2386, 156 L.Ed.2d 376 (2003) (internal quotation marks omitted). " 'Although the source of the President's power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the "executive Power" vested in Article II of the Constitution has recognized the President's "vast share of responsibility for the conduct of our foreign relations." ' " *Id.* (quoting *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 610–11, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring); *see also, e.g., First Nat'l City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 767, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (explaining that the President has "the lead role ... in foreign policy"); *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 109, 68 S.Ct. 431, 92 L.Ed. 568 (1948) (noting the President's role as the "Nation's organ in foreign affairs").

The majority today declares that the United States has sovereignty over territory of a foreign state, over the objections of the executive branch. Indeed, both parties to the Guantanamo Lease and its associated treaties—Cuba and the United States (through the executive branch)— maintain that Guantanamo is part of *Cuba.* Nevertheless, the majority announces that the United States has annexed Guantanamo. In so doing, the majority "compromise[s] the very capacity of the President to speak for the Nation with one voice in dealing with other governments." *Crosby v. Nat'l Foreign Trade Council,* 530 U.S.

363, 381, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). It has created an inconsistency in our nation's foreign policy, with one branch (which has primary responsibility in this field) declaring that the United States is not sovereign over Guantanamo, and a second branch (which is not politically accountable) declaring that it is. The complications that flow from such a situation are as obvious now as they were to the framers, who chose to avoid them by granting to the President the lead authority in foreign affairs.

Perhaps in some circumstance, a federal court would be obliged in the execution of its constitutional duties to declare, over the objections of the executive branch, that the United States is sovereign over some territory. However, in view of the constitutional allocation of powers, and the need for the United States to speak with one voice in dealing with foreign nations, federal courts should tread lightly. The question whether the United States has sovereignty over Guantanamo is undeniably close. That being so, the issue is particularly sensitive and the declarations by the executive branch regarding foreign policy should carry significant weight. The majority's failure to credit the executive branch's position on sovereignty over Guantanamo is an unwise and unwarranted extension of judicial authority in an arena belonging primarily to the executive branch.

### 4. *Deferral*

As noted, the Supreme Court has recently granted certiorari in a consolidated appeal that provides the Court with an opportunity to consider the question about which the majority and I disagree. The orders granting certiorari were limited to this question: "Whether United States courts lack jurisdiction to consider challenges to the legality of the detention of

foreign nationals captured abroad in connection with hostilities and incarcerated at the Guantanamo Bay Naval Base, Cuba." I believe that we should wait to hear the Supreme Court's answer to that question, because the views that we express here will become obsolete as soon as the Supreme Court renders its decision.

The issues that Mr. Gherebi raises are significant and troubling. Under existing Supreme Court precedent, however, I do not believe that we have jurisdiction to reach them.[10] There are good arguments that can (and undoubtedly will) be made in support of the proposition that federal courts *should* have the power to hear habeas petitions of prisoners held by officers of the United States government, whatever the prisoners' nationality and whatever their situs of imprisonment. If the Supreme Court is persuaded by those arguments to modify or overrule *Johnson,* I look forward to reaching the merits of this case. But until the Supreme Court speaks, nothing that the majority or I say can have any legal effect. Our decision is, in a practical sense, advisory. I therefore believe that we should defer submission until the Supreme Court decides *Rasul* and *Al Odah.*

5. *Conclusion*

It is of grave concern when federal courts, traditionally the guardians of our Constitution and our liberties, turn away claims that government officials have violated an individual's rights. I am reluctant, as was the district court, to hold that the court lacked jurisdiction over Mr. Gherebi's petition for habeas corpus, and my view should not be mistaken for approval either of Mr. Gherebi's detention or of the precedent that prevents us from scrutinizing it. But I am equally reluctant to distort treaties, leases, and Supreme Court cases to reach a more desirable

outcome. Change in the law, if any there will be, must come from the Supreme Court. Failing that, a remedy, if any there will be, must come from Congress and the executive branch.

Accordingly, and regrettably, I dissent.

---

10. For the same reason, I would not reach the issue of venue.